49885-7

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.
Magistrate Judge: **02-61711**

**CIV - ROETTGER**

FINE LINE CONSTRUCTION
AND ELECTRIC, INC.

  Plaintiff

vs.

SIMPLEX GRINNELL, LP.,

  Defendant

_____/

**MAGISTRATE JUDGE**
**~ SELTZER ~**

2002 DEC -5 PM 3: 15
CLERK U.S. DIST. CT.
S.D. OF FL.-FTL.

FILED BY: _____ D.C.

## NOTICE OF REMOVAL

  Defendant SIMPLEX GRINNELL, LP., by and through its undersigned attorneys, and pursuant to 28 U.S.C. Section 1446 and Rule 81(c), Federal Rules of Civil Procedure, hereby provides notice of removal of this cause to this Court from the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, and states:

## GROUNDS FOR REMOVAL – DIVERSITY JURISDICTION

  As is apparent on the face of the amended complaint at issue (attached hereto as **Exhibit A**), the Plaintiff FINE LINE CONSTRUCTION AND ELECTRIC, INC., is a Florida corporation. SIMPLEX GRINNELL, LP., is a foreign corporation organized under the laws of Delaware and headquartered in Massachusetts where it maintains its principal place of business for overall direction and control of its operations. Accordingly, diversity of citizenship exists between the parties.

CASE NO.

The amended complaint at issue asserts in Count III indemnification relative to a claim asserted against FINE LINE CONSTRUCTION by a third party, Bombardier/Lear Jet. (*See also*, general allegations ¶¶ 13 and 14). Bombardier/Lear Jet asserts claims for which FINE LINE CONSTRUCTION is seeking indemnity in an amount of at least $2.9 million. Attached hereto as **Exhibit B** is a true and correct copy of one such pending claim for which FINE LINE CONSTRUCTION is seeking indemnification. As such, the amount in controversy well exceeds $75,000.

Based on the diversity of citizenship between the parties and the fact that the amount in controversy exceeds $75,000, exclusive of fees and costs, jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1441 and 1332.

**TIME FOR REMOVAL**

On November 11, 2002, the Defendant first received a copy of the amended complaint filed by the plaintiff in the Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida, on November 11, 2002. November 11, 2002 was the first date that the Defendant or its counsel received a copy of the amended complaint or any other filing in this matter. A true and correct copy of the amended complaint received is attached hereto as **Exhibit A**, together with the transmittal cover letter from Plaintiff's

CASE NO.

counsel.  No other pleadings, including any original complaint, have been received or

served on the Defendant in this case at any time.

WE HEREBY CERTIFY that a true copy of the foregoing was mailed ~~and faxed~~

on 5ᵗʰ day of December , 2002 to all parties on the attached service list.

WICKER, SMITH, O'HARA, MCCOY,
GRAHAM & FORD, P.A.
Attorney for Defendant
1 East Broward Blvd.
South Trust Tower, Suite 500
P.O. Box 14460
Ft. Lauderdale, FL 33302
Phone: (954) 467-6405
Fax: (954) 760-9353

By: _____
James E. Zloch
Florida Bar No. 241776
Michael T. Dolce
Florida Bar No. 48445

CASE NO.

## Service List

Robert H. Schwartz, Esq.
Jason K. Gunther, Esq.
Adorno & Yoss, P.A.
Attorneys for Plaintiff
888 S.E. Third Avenue, Suite 500
Fort Lauderdale, Florida 33316

Exhibit A

**ADORNO & YOSS**
A PROFESSIONAL ASSOCIATION
888 S.E. 3RD AVENUE, SUITE 500
FORT LAUDERDALE, FLORIDA 33335
PHONE: (954) 523-5885, FAX: (954) 760-9531
WWW.ADORNO.COM

JASON K. GUNTHER

EMAIL: JKG@ADORNO.COM

November 7, 2002

Michael Dolce, Esquire
Wicker Smith O'Hara McCoy Graham & Ford
One East Broward Boulevard, 5th Floor
Ft. Lauderdale , FL 33302

> **Re:    Fine Line v. Simplex**
> **003919.0101**

Dear Mr. Dolce:

This correspondence confirms our agreement that you shall accept service of the complaint in the matter of <u>Fine Line v. Simplex</u>.  We thank you for this courtesy and for your time and cooperation.  Enclosed is the Amended Complaint with exhibits.

Please contact us if there are any questions regarding this correspondence or any other issue in this matter.

Sincerely,

Jason K. Gunther

JKG/gtm

[L4019958]

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA

CASE NO.: 02-17252 CACE (08)

FINE LINE CONSTRUCTION
AND ELECTRIC, INC.,

       Plaintiff,

vs.

SIMPLEX GRINNELL, LP.,

       Defendants.

_____/

## AMENDED COMPLAINT

The Plaintiff, FINE LINE CONSTRUCTION AND ELECTRIC, INC. ("Fine Line"),

sues Defendants, SIMPLEX GRINNELL, LP. ("Simplex"), and alleges:

1.     This is an action for damages in excess of Fifteen Thousand Dollars

($15,000.00) exclusive of interests and costs.

2.     At all times material to this Complaint, Fine Line was a Florida corporation

with its principle place of business in Broward County, Florida.

3.     At all times material to this Complaint, Simplex was a foreign corporation

doing business in Broward County, Florida.

4.     At all times materials to this Complaint, Simplex designed, manufactured,

assembled, distributed, inspected, sold and delivered into the stream of commerce a fire

detection system comprised of various components including pull boxes, heat detectors,

smoke detectors, and an alarm panel as set forth in the Simplex Building System's

Quotation dated October 21, 1999. (See Exhibit "A").

CASE NO: 02-17252 CACE (08)

5.      Fine Line is an electrical contractor doing business in Broward County, Florida.

6.      On or about December 22, 1999, Konover Construction Corporation South ("Konover") entered into a subcontract agreement with Fine Line to supply labor, materials, equipment, transportation, insurance, supervision and all things necessary to furnish and install a complete electrical package for the Bombardier Lear Jet hanger expansion at the Ft. Lauderdale Airport including, but not limited to, the installation of a fire detection system. (See Exhibit "B").

7.      Konover also hired Law-Kingdom Engineering and Architecture to design the hanger for Bombardier Lear Jet.

8.      The specifications for the fire alarm system created by Law-Kingdom, required the use of approved manufacturers of such systems including specifically Simplex. (See Exhibit "C").

9.      In furtherance of their contract with Konover, Fine Line purchased a fire alarm detection system from Simplex for incorporation into the Bombardier hanger project as described in the Simplex Building Systems Quotation. (See Exhibit "D").

10.     As of March 7, 2001 or March 13, 2001, Simplex represented that work/construction on the Bombardier hanger project was substantially complete and that the Simplex system/equipment was operating according to their published specifications and that, accordingly, Simplex' one (1) year warranty was then in effect and would expire on March 6, 2002. (See Exhibit "D").

11.     The express warranty provided by Simplex to Fine Line provides, in part, that:

WARRANT: Simplex warrants to the purchaser (1) of new Simplex products that during the effective period the warranty such product shall be free of defects in workmanship and materials.  Simplex

2

CASE NO: 02-17252 CACE (08)

warrants that the product as distinguished from the software be free from defects and materials and workmanship under normal use for the period of one (1) year from the date of first beneficial use of all or any part of the product or eighteen (18) months after product shipment, which ever is earlier. (See Exhibit "E").

12.     On October 23, 2001, Bombardier Lear Jet was making use of the Simplex alarm system that had been installed by Fine Line when the system malfunctioned resulting a deluge of water and chemical foam within the Bombardier hanger allegedly causing significant damage to the hanger and its contents, including Lear Jets.

13.     Bombardier has made written demand upon Fine Line to indemnify it for its losses.

14.     Bombardier has also made written demand upon Konover for full indemnification of its losses and Konover has, in turn, made a demand upon Fine Line to be fully indemnified as well.

15.     At all times materials to this action, Fine Line installed the Simplex alarm system in full compliance of all applicable fire codes, buildings codes, plans and designs and the system was used in the manner in which it was intended.

16.     As a result of the foregoing the law firm of Adorno & Yoss, P.A., has been retained to represent Fine Line and attorneys fees and expenses have been incurred by or on behalf of Fine Line for which full reimbursement is demanded.

## COUNT I - NEGLIGENCE

17.     Fine Line incorporates paragraphs 1 through 16 as though fully stated herein.

18.     All times materials to this Complaint, Simplex owed a duty to the public in general and to Fine Line, in particular, to design, manufacturer, assemble, inspect, test and distribute the alarm system and all of its components in a reasonable and safe manner.

CASE NO: 02-17252 CACE (08)

19.   At all times material to this Complaint, Simplex further owed a duty to the public in general and to Fine Line in particular to adequately warn of the dangerous propensities in the design, manufacture and assembly of the fire alarm protection system in general and the need to further weather proof the pull boxes in particular.

20.   Notwithstanding such duties, Simplex breached its duties and committed the following negligent acts and/or omissions which were a legal cause of Fine Line's damages:

a.   Negligently and carelessly designed and manufactured the pull boxes and the alarm system so that they were susceptible to corrosion and false positive detection of fire.

21.   As a direct and proximate result of the aforementioned negligence of Simplex, Fine Line has suffered has significant damages including but not limited to expense of repairs to the hanger and potential contractual liability to Bombardier and/or Konover to fully reimburse them for their losses, plus attorney's fees and costs.

## COUNT II

Fine Line adopts and realleges Paragraphs 1-16 as though fully set forth herein and states as follows:

22.   At all times material to this Complaint, Simplex designed, manufactured, assembled, distributed and otherwise placed into the stream of commerce the alarm system installed by Fine Line.

23.   At all times material to this Complaint, Simplex designed, manufactured, assembled, distributed and sold the alarm system to Fine Line in an unreasonably dangerous condition in that the system was susceptible to corrosion upon exposure to rain,

ADORNO & YOSS, P.A.
2601 SOUTH BAYSHORE DRIVE • SUITE 1600 • MIAMI, FLORIDA 33133 • TELEPHONE 305-858-5555 • TELEFAX 305-858-4777

CASE NO: 02-17252 CACE (08)

the elements and humidity, making it unreasonably dangerous to its users. The alarm system was defective and unreasonably dangerous by reason of its design and manufacture or put to the use that it was reasonably to be foreseeable and further being aware of said condition Simplex failed to warn in any manner Fine Line or any user of the product of such defective and unreasonably dangerous propensities of the product to corrode or otherwise malfunction upon exposure to the elements.

24.     The Simplex alarm system was defective and in an unreasonably dangerous condition when its components and the system as a whole were designed, manufactured, assembled, distributed and sold by Simplex.

25.     The Simplex alarm system was defective and in an unreasonably dangerous condition at the time it malfunctioned as alleged above.

26.     As a direct and proximate result of the defective and unreasonably dangerous condition of the alarm system and Simplex' failure to warn, Fine Line suffered severe and significant damages including but not limited to expense of repairs to the hanger and potential contractual liability to Bombardier and/or Konover to fully reimburse them for their losses, plus attorney's fees and costs.

## COUNT III - INDEMNITY

Fine Line adopts and realleges Paragraphs 1-16 as though fully set forth herein and states as follows:

27.     Fine Line and Simplex had a special relationship with respect to the fire alarm system at issue in that Fine Line purchased the fire alarm system and all of its components from Simplex for installation at the Bombardier project.

CASE NO: 02-17252 CACE (08)

28.     The sole cause of the malfunction of the fire alarm system which resulted in damage to Bombardier Lear Jet was a defect in the design and/or manufacture of the alarm system and/or its components by Simplex.

29.     Fine Line is entirely without fault.

30.     If Fine Line is ultimately determined to have any liability to Bombardier or Konover for the malfunction of the fire alarm system, any such liability would be based solely upon the active negligence of Simplex and any such liability on the part of Fine Line could only be vicarious, constructive, derivative or based on the special relationship between Fine Line and Simplex.

31.     Fine Line is entitled to common law indemnity from Simplex including but not limited to attorney's fees and costs.

## COUNT IV - CONTRIBUTION

Fine Line adopts and realleges the allegations contained in Paragraphs 1-16 as though fully stated herein and further states as follows:

32.     If it is determined that both Fine Line and Simplex are liable to Bombardier and/or Konover for the damages resulting from the malfunction of the fire alarm system so that common liability exists, Fine Line is entitled to contribution from Simplex based on its pro rata share of liability pursuant to Florida Statute 768.31.

## COUNT V- BREACH OF EXPRESS WARRANTY

Fine Line incorporates the allegations of Paragraphs 1-16 as though fully set forth herein and further states as follows:

CASE NO: 02-17252 CACE (08)

33.    As set forth in Exhibit "A", Simplex expressly warranted to Fine Line that its products would be free of defect and workmanship and material during the period of the warranty.

34.    Simplex breached its express warranty to Fine Line by providing designs and/or components for the alarm system which were defective in their design and/or manufacture. As a result of the breach of express warranty, Fine Line has incurred severe significant damages including but not limited to cost of repairs at the Bombardier project and potential obligation to reimburse Bombardier and/or Konover for damages resulting from the breach of warranty, plus attorney's fees and costs.

## VII - BREACH OF IMPLIED WARRANTY

Fine Line adopts and realleges its prior allegations contained in Paragraphs 1-16 above as though fully set forth herein and further states as follows:

35.    All conditions precedent to this action have occurred, been performed or waived.

36.    This is an action for breach of implied warranties.

37.    Simplex sold an alarm system and all of its components to Fine Line for installation and incorporation into the Bombardier hanger project.

38.    Simplex impliedly warranted that the alarm system and all of its components were suitable as a fire alarm detection system and Simplex knew that Fine Line was purchasing the fire alarm system and all of its components for that purpose and that Fine Line was relying on Simplex's judgment in providing a suitable fire detection system.

39.    At all times material to this Complaint, Simplex designed, manufactured, constructed and/or completed the fire detection system and all of its components, however,

CASE NO: 02-17252 CACE (08)

said fire detection system and/or its components were not reasonably fit for their intended use as a fire detection system because of defective work including but not limited to the following:

      a.    The pull boxes were not suited for use in a location which may be exposed to the elements including rain and humidity.

40.    As a result of the failure of the Simplex fire detection systems to perform as warranted, Fine Line will be required and has been required to conduct certain repairs at the Bombardier hanger and/or may be required to reimburse Bombardier and/or Konover for their damages, plus attorney's fees and costs.

WHEREFORE, Fine Line respectfully requests this Court to enter judgment in its favor and against Simplex for an amount in excess of $15,000.00 plus interest, costs, attorney's fees and such other and further relief as the Court deems just and proper.

DATED this ___7___ day of ___NOVEMBER___, 2002.

                    ADORNO & YOSS, P.A.
                    Attorneys for Fine Line
                    888 S. E. Third Avenue, Suite 500
                    Fort Lauderdale, FL 33316
                    (954) 52305885
                    Fax: (954) 760-9531

                    ROBERT H. SCHWARTZ
                    FLA. BAR NO. 301167
                    JASON K. GUNTHER
                    FLA. BAR NO. 091227

[L4019912]

# S Simplex
## BUILDING SYSTEMS QUOTATION

Simplex Time Recorder Co.
Gardner, MA 01441-0001 U.S.A.
License#: FLORIDA ALARM LICENSE #EF0000056

No: 263-801139-02 BOMBADIER AVIATION/ FIRE ALARM
PG: 4 of 11
Date: 10-21-1999
BID: 2 of 5

TO: SECTION 16721
FIRE ALARM SYSTEM "FACP-1"
AUTOMATIC RELEASE PANEL

| QUANTITY | TYPE | DESCRIPTION |
|---|---|---|
| 1 | 4100-8001 | FIRE ALARM PANEL |
| 1 | 2975-9194 | BACK BOX 8 UNIT, BEIGE |
| 2 | 2081-9278 | BATTERY 33AH SHORT |
| 1 | 2081-9042 | TCS-HW AC LINE SUPPRESSOR |
| 6 | 2081-9032 | COIL SUPERVISION MODULE |
| 81 | 4098-9410 | HEAT DETECTOR 200 ROR FOR BASE |
| 81 | 4098-9788 | SSD 2-WIRE DET REM LED BASE |
| 3 | OPFA | PULL STATION, BLUE, RELEASE |

## COMMENTS

SCOPE: PROVIDE SIMPLEX 4100 PANEL FOR SUPPRESSION RELEASE "FACP-1".
AS PER PLANS AND SPECIFICATIONS IN SECTION 16721, DATED 12/7/98 RCE
REVIEW. 12/15/98 CITY REVIEW #1.

INCLUDED IN THIS QUOTATION:
1- MATERIALS LISTED ON THIS QUOTATION.
2- SURFACE FREIGHT.
3- PRODUCT DATA SUBMITTALS.
4- WIRING DIAGRAMS & SHOP DRAWINGS ONLY.
5- SYSTEM PROGRAMMING.
6- SYSTEM TESTING & CERTIFICATION.

NOT INCLUDED IN THIS QUOTATION:
1- INSTALLATION NOT INCLUDED.
2- PROFESSIONAL ENGINEER SIGNED & SEALED DRAWINGS NOT INCLUDED.
3- SALES TAX NOT INCLUDED.

ANY QUESTIONS REGARDING THIS QUOTATION: PLEASE CONTACT JIM MALONEY:
TELEPHONE: (954) 431-3700 OR (305) 930-5700
VOICE MAIL/PAGER: (305) 656-4467
FAX: (954) 435-6650



PLAINTIFF'S
EXHIBIT
A

# BUILDING SYSTEMS QUOTATION

## Simplex

Simplex Time Recorder Co.
Gardner, MA 01441-0001 U.S.A.
Licensed: FLORIDA ALARM LICENSE #EF0000058

No: 263-801139-04  BOMBADIER AVIATION/ P.A.SYSTEM
PG: 6 of 11
Date: 10-21-1999
BID: 4 of 5

TO:    SECTION 16730
PUBLIC ADDRESS SOUND SYSTEM

| QUANTITY | TYPE | DESCRIPTION |
|---|---|---|
| 1 | 5120-9001 | 5120 BCS 24 STATIONS |
| 2 | 5120-9923 | VSBLK TERMINATION BLOCK |
| 1 | 5120-9924 | OST039.512 EQUIPMENT BACKBOARD |
| 2 | 5120-9930 | 25 PAIR CABLE 5 FEET |
| 1 | 5100-9867 | SDWR-40BPA RACK BACK BAY |
| 1 | 5100-9865 | SDWR-40CSA RACK CENTER SECTION |
| 3 | 5100-9840 | EB1 1 3/4" BLANK PANEL |
| 3 | 5100-9841 | EB2 BLANK STEEL PANEL 3 1/2" |
| 2 | 5100-9842 | EB3 5 1/4" BLANK PANEL |
| 171 | 5120-9418 | 8CSW/T70-25  *SPKRS* |
| 64 | 5120-9420 | BAFFLE ROUND STEEL 62-8 |
| 64 | 5120-9481 | ENCLOSURE RND W/RAILS EZ95-8 |
| 107 | 5120-9493 | ENCLOSURE SQ SURFACE SE181-R |
| 107 | 5120-9430 | BAFFLE SQUARE STEEL 169-8 |
| 20 | 5120-9583 | PA430T PAGING HORN 60H/40V/30W |
| 4 | 5100-9414 | UMA75TII 75 W 4 UTIL MIXER AMP |
| 4 | 5100-9182 | RM-2RK KIT 5100-9214/9414/18 |
| 4 | 5120-9926 | VSLPT PUNCH BLK IMPEDANCE MATC |

# **S3 Simplex**                    **BUILDING SYSTEMS QUOTATION**

Simplex Time Recorder Co.
Gardner, MA 01441-0001 U.S.A.
License#: FLORIDA ALARM LICENSE #EF0000056

No: 263-801139-04 BOMBADIER AVIATION/P.A.SYSTEM
PG: 7 of 11
Date: 10-21-1999
BID: 4 of 5

## COMMENTS

SCOPE: PROVIDE SIMPLEX 5100 SERIES PUBLIC ADDRESS SOUND EQUIPMENT AS
PER PLANS AND SPECIFICATIONS DATED 12/7/98 RCE REVIEW & 12/15/98 CITY
REVIEW #1.

INCLUDED IN THIS QUOTATION:
1- MATERIALS LISTED ON THIS QUOTATION.
2- SURFACE FREIGHT.
3- PRODUCT DATA SUBMITTALS.
4- WIRING DIAGRAMS & SHOP DRAWINGS ONLY.
5- SYSTEM PROGRAMMING.
6- SYSTEM TESTING & CERTIFICATION.

NOT INCLUDED IN THIS QUOTATION:
1- INSTALLATION NOT INCLUDED.
2- PROFESSIONAL ENGINEER SIGNED & SEALED DRAWINGS NOT INCLUDED.
3- SALES TAX NOT INCLUDED.

ANY QUESTIONS REGARDING THIS QUOTATION; PLEASE CONTACT JIM MALONEY:
TELEPHONE: (954) 431-3700 OR (305) 930-5700
VOICE MAIL/PAGER: (305) 656-4467
FAX: (954) 435-5550

## BUILDING SYSTEMS QUOTATION

# ⑤ Simplex

Simplex Time Recorder Co.
Gardner, MA 01441-0001 U.S.A.
License: FLORIDA ALARM LICENSE #EF0000056

No: 263-801139-05 BOMBADIER AVIATION/ SECURITY
PG: 9 of 11
Date: 10-21-1999
BID: 5 of 6

| QUANTITY | TYPE | DESCRIPTION |
|----------|------|-------------|
| 4 | 3208-9514 | TD TIME DELAY OPTION |
| 4 | 2750-9002 | DET/SEC,PUSH BUT IND 810-70 |
| 100 | 3209-9781 | 1386 ISOPROX CARD SIMPLEX LOGO |
| 1 | 9500-0085 | DRAWINGS/DRAFTING SERVICES |
| 1 | 9500-0086 | SURVEY/DESIGN SERVICES |

### COMMENTS

This an equipment only quotation. No installation labor has been included at this time.

This quotation is based on City Review #1 Drawings dated 12-15-98, RCE Drawings dated 12-7-98 and Specification Section #16725 Controlled Access Security System.

This Quotation includes the following:
All Security Equipment as Listed Above
Shop drawings, Submittals and Wiring Diagrams
System Test and Certification

This Quotation excludes the following:
Any and All Electric Locking Hardware
Any and All Mounting and Termination of Security Equipment
Any and All 110VAC
Any and All Wire and Conduit Installation
Any and All Permit, Bonding and Engineering Fees
Any and All Applicable Taxes

Please reference this Building Systems Quotation (Ref: #263-990113-10) in all documentation regarding this project.

**GRAND TOTAL NET COST FOR BIDS 1 - 5 F.O.B. SHIPPING POINT . . . . $80,000.00**

# BUILDING SYSTEMS QUOTATION

## Simplex

Simplex Time Recorder Co.
Gardner, MA 01441-0001 U.S.A.
License#: FLORIDA ALARM LICENSE #EF0000056

No: 263-601139-05 BOMBADIER AVIATION SECURITY
PG: 8 of 11
Date: 10-21-1999
BID: 5 of 5

TO:  SECTION 16725
ACCESS CONTROL SECURITY SYS

| QUANTITY | TYPE | DESCRIPTION |
|---|---|---|
| | **NT3400 ACCESS CONTROL SYSTEM** | |
| 1 | 3400-8103 | FILESERVER, NT3400 |
| 1 | 3400-9102 | PARRALLEL PRINTER W/CABLE |
| 1 | 3400-9103 | SERIAL PRINTER W/CABLE |
| 1 | 3400-9818 | 700 VA SMART-UPS |
| 1 | 9500-0029 | CUST TRNG-NT3400 ACCESS CONTR |
| | **NT3000 ID BADGING SYSTEM** | |
| 1 | 3400-8105 | NT3000 VIDEO BADGING HOST |
| 1 | 3400-9224 | VIDEO CAMERA PACKAGE #2 |
| 1 | 3400-9220 | M9002-985 ULTRA 300 PRINTER |
| 1 | 3209-9737 | 174404 DURACARD FOR BADGING |
| 1 | 9500-0027 | CUST TRAINING BADGING AFTERMKT |
| | **FIELD EQUIPMENT** | |
| 1 | 3500-9100 | ISC BASELINE 120V |
| 1 | 2081-9275 | BATTERY 18AH |
| 1 | 3210-9803 | POWER SUPPLY 12VDC 4 AMP |
| 1 | 3210-9804 | BATTERY W/HARNESS 12V 10AH |
| 4 | 3209-9719 | 6355AGNOO-S1291 PROXPRO READER |
| 4 | 2760-9118 | MAG CONT PRESS FIT BROWN 1078C |
| 4 | 2750-9813 | DS150i REQUEST TO EXIT SENSOR |

# BUILDING SYSTEMS QUOTATION

## ⑤ Simplex

**Simplex Time Recorder Co.**
Gardner, MA 01441-0001 U.S.A.

No: 263-801139-05 BOMBADIER AVIATION/ SECURITY
PG. 10 of 11
Date: 10-21-1999

### SIMPLEX BUILDING SYSTEMS GENERAL TERMS AND CONDITIONS OF SALE

For good and valuable consideration, the parties agree that the terms and conditions contained herein are the sole terms and conditions of sale and/or for service and represent the sole and complete Agreement between the parties and supersede all prior oral and/or written representations, understandings, proposals, agreements, and communications regarding the subject matter hereof. The parties agree that no additional terms will be binding upon Simplex even if they appear on Purchaser's formal purchase order, acceptance form, or any other of Purchaser's documents unless signed by an authorized representative of Simplex at its headquarters in Gardner, Massachusetts.

1. **VALIDITY PERIOD:** The price quotes provided are valid for 30 days unless otherwise specified in writing by Simplex.

2. **PAYMENT TERMS:**

A. GENERAL PAYMENT TERMS are net thirty (30) days from date of invoice where satisfactory upon account credit is established and maintained. Simplex reserves the right to revoke or modify Purchaser's credit at its sole discretion. ...

B. CUSTOM SOFTWARE PAYMENT TERMS are as provided in section A. above with the following exceptions. ...

C. SECURITY SYSTEM/ACCESS CONTROL SYSTEM PAYMENT TERMS are as provided in Section A. above with the following exceptions. A non-refundable 20% down payment is required with Purchaser's order. Progress Payments will be invoiced based upon shipments to Purchaser.

D. CANCELLATION: Any cancellation must be made in writing. ...

3. SIMPLEX SERVICES: Purchaser further agrees that Simplex obtains various levels of services and that the Purchaser, after reviewing the same, has contracted with Simplex to perform only the services described in writing in this Agreement. ...

4. SHIPMENT: All Equipment is shipped F.O.B. shipping point.

5. SECURITY INTEREST: The Purchaser grants to Simplex, and Simplex retains, a security interest in all Product, Software, and proceeds thereof shipped pursuant to this Agreement until the Purchaser shall have made full payment for the Product. ...

6. LIMITATION OF WARRANTY: Purchaser understands that Simplex is not an insurer. ...

THIS WARRANTY DOES NOT APPLY TO ANY PRODUCT OR SOFTWARE WHICH HAS BEEN SUBJECTED TO ABUSE, MISHANDLING, OR IMPROPER USE AS DETERMINED BY SIMPLEX AND IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7. LIMITATION OF LIABILITY: SIMPLEX SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, ECONOMIC, OR CONSEQUENTIAL LOSS OR DAMAGE TO THE PURCHASER OR USER OF THIS PRODUCT AND/OR SOFTWARE ARISING OUT OF, AMONG OTHER THINGS, THE OPERATION OR FAILURE OF THE PRODUCT AND/OR SOFTWARE TO OPERATE, THIS AGREEMENT, THE INSTALLATION, USE, DESIGN OR FUNCTION OF ANY SIMPLEX PRODUCT AND/OR SOFTWARE.

8. LIMITATION OF REMEDY: It is understood and agreed that since it is impractical and extremely difficult to fix actual damages, if any, or ascertain what, if any, portion of any loss or injury would be proximately caused by the failure of Simplex's Product and/or Software to operate properly... THE PARTIES AGREE THAT THE PRICE PAID FOR THE PRODUCT, SOFTWARE AND/OR SERVICES, ... SHALL BE THE PURCHASER'S SOLE, COMPLETE AND EXCLUSIVE REMEDY AND SHALL BE PAID AND RECEIVED AS LIQUIDATED DAMAGES OR A LIMITATION OF LIABILITY AMOUNT AGREED ON BY THE PARTIES AND NOT AS A PENALTY. IN NO CIRCUMSTANCES WILL SIMPLEX BE HELD LIABLE FOR ANY CLAIMS, LOSSES, DAMAGES OR INJURIES ARISING FROM OR CAUSED BY, THE PURCHASER'S OR ANY OTHER PARTY'S MATERIAL, EQUIPMENT, ACTIONS, OR OMISSIONS. ...

# BUILDING SYSTEMS QUOTATION

## ☒ Simplex

Simplex Time Recorder Co.
Gardner, MA 01441-0001 U.S.A.

No: 263-801139-06  BOMBADIER AVIATION/ SECURITY
PG. 11 of 11
Date: 10-21-1999

9. INSURANCE OBLIGATIONS: It is understood and agreed by the Purchaser that Simplex is not an insurer and that it is the Purchaser's obligation to obtain and maintain any insurance covering any losses to property or personal injury or any other damage which may occur at the premises where the Simplex Product, Software or Services, which form the basis of this Agreement, are delivered, assembled, installed, used, or performed. The Purchaser agrees to list Simplex as an additional insured on all such policies and to provide Simplex a copy of the Certificate of Insurance upon request. Purchaser further agrees that the Certificate of Insurance shall contain a provision that coverage afforded under the policies will not be canceled or materially altered until at least thirty (30) days after written notice is given to Simplex.

10. WAIVER OF SUBROGATION: Purchaser does hereby for itself and all other parties claiming under it release and discharge Simplex from and against all hazards covered by Purchaser's insurance. Nothing expressly agreed and understood that no insurance company, insurer, or any other third party will have any right of subrogation against Simplex.

11. LIMITATION ON ACTIONS: The Purchaser hereby agrees that no claim, suit or action of any kind shall be brought against Simplex, its agents, employees, and/or officers more than one year after the claim arises, whether known or unknown when the claim arises, provided however, that if there is a claim, suit, or cause of action arising under the Warranty, it must be brought, if at all, within six months of expiration of the Warranty period stated above. This clause is in no way to be interpreted as an extension of the Express Warranty stated in paragraph 4 above.

12. DRAWINGS: All drawings and wire diagrams provided by Simplex in connection with this Agreement are protected under United States Copyright Laws and intended solely for the use of the including purchaser as a general guide for the installation of the System. These drawings and wire diagrams are prepared in accordance with the project plans and specifications available to Simplex at the time of the bid and are NOT intended to be System design or approved documents. Simplex is not a design professional. In no circumstances is any clause in this Agreement or any actions taken by Simplex to be construed in such a way as to impose upon Simplex the duties or liabilities of a design professional.

13. CHANGE ORDERS: This Agreement can be modified, amended or altered only by an Agreement in writing, signed by both parties or their duly authorized representatives.

14. SOFTWARE LICENSE AND USE: Software Products provided by Simplex are licensed, not sold, to the Customer. Customer has only a non-exclusive, non-transferable license to use the Software ("License"). Simplex retains all right, title and interest in the Software. In some cases, Simplex may have a right to enhance the Software. "Software" shall mean any partial Software provided by Simplex to supply, translate from Authorize to this Agreement or under the Agreement or under the Simplex Product software under this Agreement or ordered subsequently, any modification or amendment to this Agreement. Customer shall use the Software only on the Product and at the Product site listed herein. Any license executed by Customer at any time is subject to this Agreement. The License term begins upon delivery of the Software and continues until the last use of the Software with the Product, unless terminated. Simplex may terminate this License if Customer: (1) fails to perform any obligation under the Agreement; (2) ceases to do business as a going concern; or (3) has its assets assigned or attached by law. Within two (2) days after the License terminates, Customer shall, at its expense, return the Software to Simplex and destroy all copies of the Software, including memory or storage copies.

15. PROTECTION AND NON-DISCLOSURE: Customer shall maintain the Software in strict confidence and shall disclose it only to its employees requiring access. Customer shall implement adequate procedures controlling access to and use of the Software consistent with the protection of Simplex's rights. Customer may dedicate Software only for internal use on the Product according to Simplex instructions. The Simplex legend restricting Software use must appear on any copies of the Software. Customer shall not reverse compile the Software.

16. TITLE: The Software and any relevant Product as described in this Agreement shall remain the personal property of Simplex, even if attached to realty or other property. Customer shall not sell, assign, encumber or remove the Product or Software without the prior written consent of Simplex. Customer shall perform all necessary acts to preserve and protect the right, title and interest of Simplex in the Product and Software including but not limited to signing any financing statements or other documents requested by Simplex or its agents. Simplex may inspect the Product and Software during normal business hours and may affix labels or notices of ownership on the Product and Software.

17. FORCE MAJEURE: Simplex shall not be liable for any loss or damage of any kind resulting from delay, inability to deliver, or install, or to perform any other work under this Agreement on account of fire, flood, labor problems, access to premises, accidents, acts of civil or military authorities, acts of God, or from any other causes beyond Simplex's control.

18. TAXES, LICENSES AND PERMITS: The Purchaser is responsible for obtaining all licenses, and permits and for paying all applicable taxes and fees unless otherwise agreed to in writing.

19. INSTALLATION: The installation of any Product is NOT INCLUDED unless specifically provided for in this Agreement.

20. DRUG FREE WORKPLACE POLICY: Simplex has a written drug free workplace policy available for review by written request.

21. EXPORT COMPLIANCE: All sales hereunder shall at all times be subject to the export control laws and regulations of the Government of the United States. Purchaser agrees that it shall not make any disposition, by way of trans-shipment, re-export, diversion, or otherwise, except as said laws and regulations may expressly provide. Purchaser expressly agrees, to the fullest extent permitted by law, to indemnify Simplex for any and all damage arising from the violation of any export law or regulation with respect to any goods delivered to Purchaser or at Purchaser's direction. Said damages include, but are not limited to, legal fees, court costs, export fees, and any and all other resulting costs and expenses.

22. EVENTS OF DEFAULT: Purchaser shall be in default of this Agreement upon the occurrence of, but not limited to, any of the following:

A. The Purchaser's failure to make due and punctual payment of any payment due pursuant to this Agreement;

B. The Purchaser's failure to perform any obligation under this Agreement;

C. An order, judgment or decree entered, with the approval or consent of Simplex, by any court of competent jurisdiction, approving a petition seeking reorganization of the Purchaser or appointing a receiver, trustee, or liquidator (or such other having power, under applicable law, vested in those of a receiver, trustee, or liquidator) of the Purchaser or of all or a major portion of its assets, and such order, judgment, or decree shall continue unstayed and in effect for any period of sixty (60) consecutive days;

D. The Purchaser fails to provide Simplex with adequate assurances of due performance under the Agreement, after receiving a written request for same from Simplex;

E. The Purchaser's financial position materially deteriorates; or

F. The Purchaser shall cease to do business as a going concern.

23. GENERAL: Any provision of this Agreement which is prohibited by the law of any state shall, as to such state, be ineffective to the extent of such provision without invalidating the remaining provisions of the Agreement. This Agreement shall be construed under the laws of the Commonwealth of Massachusetts.

| Offered By:<br>Simplex Time Recorder Co.   License#: FLORIDA ALARM LICENSE #CF/000006<br>3801 COMMERCE PARKWAY<br>MIRAMAR, FL 33026 U.S.A.<br><br>Telephone: (954) 431-3700 FAX: (954) 431-8850<br>Representative: JIM MALONEY  NICET #089268 | Accepted By: _____<br><br><br>Company: _____<br>Address: _____<br>Signature: _____<br>Title: _____ |

| | | |
|---|---|---|
| D-U-N-S | 00-112-6964 | |
| FEDERAL ID: | 04-2797344 | |

**INVOICE NUMBER:** 990191-01

**INVOICE DATE:** 4/27/00

# S.Simplex

**INQUIRIES:** 954-431-3700

**TERMS:** NET 30

**SHIP TO:** 263-00000000
BOMBARDIER AVIATION
C/O FINE CONSTRUCTION
AND ELECTRIC, INC.
4100 SW 11TH TERRACE
FORT LAUDERDALE, FL 33315

**BILL TO:** 262-00745543
FINE LINE CONSTRUCTION
AND ELECTRIC, INC.
P.O. BOX 1452
BOCA RATON, FL 33429

**PROGRESS BILLING #1**

**PROJECT NAME:** BOMBARDIER AVIATION
**PROJECT NUMBER:** 263-990191-01-02-03
**PURCHASE ORDER:** 191-FA

| PRODUCT ID | DESCRIPTION | QUANTITY |
|---|---|---|
| **TELEPHONE INTERCOM SYSTEM - PROJECT #263-990191-01** | | |
| OPS | V-1109RTVA PAGING 9 CIRCUIT | 1 |
| 5100-9867 | SDWR-40PBA RACK BACK BAY | 1 |
| 5100-9865 | SDWR-40CSA RACK CENTER STATION | 1 |
| 5120-9171 | DTK RMAC8 RACK SURGE SUPRESSOR | 1 |
| 5100-9845 | EB6 10 1/2" BLANK PANEL | 4 |
| 5100-9840 | EB1 3/4" BLANK PANEL | 2 |
| 5100-9841 | EB2 BLANK STEEL PANEL 3 1/2" | 1 |
| 5100-9842 | EB3 5 1/4" BLANK PANEL | 1 |
| 5120-9416 | 8C5W/T70-25 | 110 |
| 5120-9420 | BAFFLE ROUND STEEL 62-8 | 65 |
| 5120-9491 | ENCLOSURE ROUND W/RAILS EZ96-8 | 65 |
| 5120-9493 | ENCLOSURE SQUARE SURFACE SE151R | 45 |
| 5120-9430 | BAFFLE SQUARE STEEL 169-8 | 45 |
| 5120-9583 | PA430T PAGING HORN 60H/40V/30W | 20 |
| 5100-9219 | PZS140 MIXER/AMPLIFIER | 1 |
| 5100-9421 | IPA150T11 150 WATT BOOSTER AMP | 1 |
| 5100-9422 | IPA 300T 300 WATT BOOSTER AMP | 1 |
| **FIRE ALARM SYSTEM - PROJECT #263-990191-02** | | |
| 2080-9022 | COMMUNICATOR CONNECTOR CORD | 2 |
| 2080-9024 | 4 CHANNEL DUAL LINE DACT | 1 |
| 2081-9042 | TCS-HW AC LINE SUPRESSOR | 4 |
| 2081-9272 | BATTERY, 6.2 AH | 6 |
| 2081-9287 | 25 AH BATTERY | 2 |
| 2088-9032 | MR801T RELAY | 27 |
| 2096-9808 | FA/CODE CARD HOLDER 9X12 SST | 6 |
| 2098-9441 | HEAT DETECTOR 135 FX | 2 |
| 2098-9798 | 73" SAMPLING TUBE | 14 |
| 2098-9806 | REMOTE TEST STA RED LED KEY SW | 14 |
| 2975-9178 | BOX/ADDRESSABLE PULL STATION | 31 |
| 4009-9201 | NAC EXTENDER 120VAC, IDNET | 3 |
| 4010-9101 | FACP 250 PT 4 NAC 4A 120V, BEIGE | 1 |
| 4010-9700 | BASE PANEL | 1 |
| 4090-9001 | IAM SUPERVISED IDNET | 72 |
| 4090-9002 | IAM RELAY, IDNET | 11 |
| 4098-9714 | SSD PHOTO SENSOR | 25 |
| 4098-9733 | SSD HEAT SENSOR | 5 |
| 4098-9753 | SSD SENSOR DUCT HOUSING | 14 |

| | D-U-N-S | 00-112-5964 | | |
|---|---|---|---|---|
| | FEDERAL ID: | 04-2797344 | INVOICE NUMBER: | 990191-01 |

## S.Simplex

INVOICE DATE:      4/27/00

INQUIRIES:     954-431-3700                                    TERMS:       NET 30

SHIP TO:     263-00000000                         BILL TO:   262-00745543
             BOMBARDIER AVIATION                          FINE LINE CONSTRUCTION
             C/O FINE CONSTRUCTION                           AND ELECTRIC, INC.
             AND ELECTRIC, INC.                               P.O. BOX 1452
             4100 SW 11TH TERRACE                         BOCA RATON, FL  33429
             FORT LAUDERDALE, FL  33315

**PROGRESS BILLING #1**

PROJECT NAME:         BOMBARDIER AVIATION
PROJECT NUMBER:      263-990191-01-02-03
PURCHASE ORDER:      191-FA

| PRODUCT ID | DESCRIPTION | QUANTITY |
|---|---|---|
| **FIRE ALARM SYSTEM - PROJECT #263-990191-02 (CONTINUED)** | | |
| 4098-9792 | SSD SENSOR BASE | 15 |
| 4099-9003 | PULL STATION IDNET PUSH | 31 |
| 43T-G6-24-R | BELL 6" 24 VAC RED | 1 |
| 4606-9101 | LCD ANNUNCIATOR FOR 4010 FACP | 3 |
| 4903-9418 | A/V 75 CD RED SYNC QUICK ALERT | 31 |
| 4903-9419 | A/V 110 CD RED SYNC QUICKALERT | 16 |
| 4903-9714 | A/V 15 CD RED SYNC QUICK ALERT | 41 |
| 4904-9331 | V/O 15 CD RED SYNC QUICK ALERT | 16 |
| OPFA | WBB-R WP/WSI BOX | 1 |
| **SECURITY SYSTEM - PROJECT #263-990191-03** | | |
| 3400-8103 | NT3400 FILE SERVER | 1 |
| 3400-9104 | PARALLEL LASER PRINTER | 1 |
| 3400-9816 | 700VA SMART UPS | 1 |
| 3400-8105 | NT3000 VIDEO BADGING HOST | 1 |
| 3400-9223 | VIDEO CAMERA PACKAGE #1 | 1 |
| 3209-9462 | 1386 ISOPROX II CARD, GLOSS | 100 |
| 3209-9737 | 174404 DURACARD FOR BADGING | 1 |
| 3500-9100 | ISC BASELINE 120V UL | 1 |
| 3500-9801 | TWO READER MODULE | 2 |
| 3500-9802 | 8 INPUT/8 OUTPUT MODULE | 4 |
| 3500-9804 | 4120 HARDWARE CONTROLLER CARD | 1 |
| 2081-9275 | 12VDC BATTERY, 18 AH | 1 |
| 3209-9550 | 24V, 4A POWER SUPPLY IN CABINET | 1 |
| 3209-9831 | BATTERIES & HARNESS ASSY | 1 |
| 3210-9828 | POWER SUPPLY FAULT RELAY | 1 |
| 3209-9511 | 6005AKB READER, PROXPOINT, BLACK | 4 |
| 2760-9118 | MAG CONTACT PRESS FIT BROWN 1078C | 4 |
| 2750-9813 | DS150I REQUEST TO EXIT SENSOR | 4 |
| 2750-9002 | DET/SEC PUSH BUTTON IND 810-70 | 4 |
| OPAC | KYSW 7003XCYLXKA | 1 |
| 3209-9462 | 1386 ISOPROX II CARD, GLOSS | 100 |
| 3400-9315 | NT PARTICIPANT TRAINING GUIDE | 6 |
| 3210-9803 | 12V 4.0 AMP POWER SUPPLY WITH CABINET | 1 |
| 3210-9804 | BATTERY AND HARNESS ASSY | 1 |
| P310C-0000P | ELTRON P310C BADGE PRINTER | 1 |
| 3500-9880 | ISC INSTALL DOC 120V AND 12V | 1 |

# ⚡ Simplex

| | | | |
|---|---|---|---|
| | D-U-N-S | 00-112-6964 | |
| | FEDERAL ID: | 04-2797344 | |

**INVOICE NUMBER:** 990191-01

**INVOICE DATE:** 4/27/00

**INQUIRIES:** 954-431-3700

**TERMS:** NET 30

**SHIP TO:** 263-00000000
BOMBARDIER AVIATION
C/O FINE CONSTRUCTION
AND ELECTRIC, INC.
4100 SW 11TH TERRACE
FORT LAUDERDALE, FL 33315

**BILL TO:** 262-00745543
FINE LINE CONSTRUCTION
AND ELECTRIC, INC.
P.O. BOX 1452
BOCA RATON, FL 33429

**PROGRESS BILLING #1**

**PROJECT NAME:** BOMBARDIER AVIATION
**PROJECT NUMBER:** 263-990191-01-02-03
**PURCHASE ORDER:** 191-FA

| | |
|---|---|
| LOT PRICE PURCHASE ORDER #191-FA | $ 80,000.00 |
| TAX | $ 4,800.00 |
| TOTAL PURCHASE ORDER AMOUNT INCLUDING SALES TAX | $ 84,800.00 |

| **TOTAL AMOUNT THIS INVOICE - PROGRESS BILLING #1** | **PAY THIS AMOUNT** | **$ 40,000.00** |
|---|---|---|

| REMAINDER TO INVOICE | $ 44,800.00 |
|---|---|

*SIMPLEX TIME RECORDER COMPANY*
MERCHANDISE MENTIONED HAS BEEN MANUFACTURED IN ACCORDANCE WITH THE U.S. FAIR LABOR STANDARDS ACT AS AMENDED.

---

**REMITTANCE COPY**

PLEASE TEAR OFF THIS PORTION WITH YOUR PAYMENT - WRITE INVOICE NO. ON YOUR CHECK

| BILL TO: | 262-00745543 | **PAY THIS AMOUNT** | **$ 40,000.00** |
|---|---|---|---|
| SHIP TO: | 263-00000000 | INVOICE NUMBER: | 990191-01 |
| REMIT TO: | SIMPLEX TIME RECORDER COMPANY | INVOICE DATE: | 4/27/00 |
| | DEPT. CH 10320 | | |
| | PALATINE, IL 60055-0320 | | PAGE 3   M-510 |

## SUBCONTRACT AGREEMENT

THIS SUBCONTRACT, made the 12ᵗʰ day of November, 1999, by and between:
KONOVER CONSTRUCTION CORPORATION SOUTH,
700 W. Hillsboro Boulevard, Suite 101, Bldg. 4, Deerfield Beach, FL  33441 (561) 447-4482, FAX (561) 447-4227
(Hereinafter "Contractor"), and

FINE LINE CONSTRUCTION & ELECTRIC, INC.
P.O. Box 1452, Boca Raton, FL 33429 PH: (561) 989-0911  FAX:  (561) 418-8604
(Hereinafter "Subcontractor").

### WITNESSETH:

WHEREAS, Contractor and Learjet Inc. (hereinafter "Owner") have entered into a contract dated Jan.25ᵗʰ, 1999 for the construction of the Learjet Hangar Facility, located at Ft Lauderdale International Airport in Ft Lauderdale , FL  33441 (hereinafter "Project"), according to the Contract Documents listed below (hereinafter "Contract Documents"); and

WHEREAS, Contractor desires to subcontract certain work specified in the Contract Documents, and Subcontractor desires to perform said work at the prices and upon the terms and conditions hereinafter expressed;

NOW, THEREFORE, in considerations of the mutual agreements herein expressed, the parties do contract as follows:

1.  Contractor shall pay Subcontractor for performance of the work subject to additions and deductions by change order, the total sum of:

EIGHT HUNDRED TWENTY ONE THOUSAND DOLLARS AND  00/100 ($821,000.00)

$821,000.00    (16-100)

This sum shall include all applicable taxes, delivery charges, permits and insurance.

2.  **Subcontractor's Scope of Work:**

"All materials and equipment purchased, supplied and installed in the building in connection with this project shall be free from asbestos and PCB's, which warranty shall survive indefinitely."

Start Date:                    **Completion Date:**

The Subcontractor is to supply labor, material, equipment, transportation, insurance, supervision and all things necessary to furnish and install a complete ELECTRICAL PACKAGE for the Bombardier Hangar Expansion in strict accordance with the contract between the Contractor and the Owner and the plans and specifications prepared by Law/Kingdon, Inc. and their consultants, collectively, the "Contract Documents". All work shall be in accordance with the following riders:

Rider "A" - Subcontractor's Scope of Work, hereinafter included as part of this Subcontract Agreement.

Rider "B" - Drawing and Specification list dated November 1, 1999, hereinafter included as part of this Subcontract Agreement.

Rider "C" - Project Construction Schedule, hereinafter included as part of this Subcontract Agreement. (as applicable)

Rider "D" - Schedule of Values, Unit Prices, hereinafter included as part of this Subcontract Agreement. (as applicable)

a.  **Responsibilities.** Subcontractor shall perform all work and shall furnish all supervision, labor, materials, plant, scaffolding, tools, equipment, supplies and all other things necessary for the construction and completion of the work described above and work incidental thereto, in strict accordance and full compliance with the terms of this Subcontract to the satisfaction of Contractor and Owner and in the most sound and workmanlike manner.

b.  **Pass Through Obligations.** In respect to work covered by this Subcontract, Subcontractor shall assume all obligations, risks and responsibilities which Contractor has assumed towards Owner in the Contract Documents, except as may be expressly modified herein. In case of a conflict between this Subcontract and the Contract Documents, the Subcontract shall govern. Nothing contained in this Subcontract shall prejudice any of the rights of the Owner or Architect under the Contract Documents. Subcontractor shall insure that each of its subcontractors and suppliers are bound to the Contract Documents in a manner similar to that set forth herein.

1/4/00



Bombardier Hangar Expansion / Agreement #90009-10
Page Two of Fifteen

Subcontractor's Scope of Work (Continued)

c. **Fit of Subcontractor's Work**. Before proceeding with the Work under the Subcontract, the Subcontractor will check all previous and surrounding Work done by other related trades and determine the correctness of same as required to incorporate the Work of this Subcontract, and shall report any discrepancies immediately to the Contractor. Failure on the Subcontractor's part to report discrepancies will relieve the Contractor of any and all claims to recover cost or damage resulting therefrom.

d. **Approvals and Substitutions**. Subcontractor shall deliver to Contractor copies of shop drawings, cuts, samples and material lists required by Contractor or the Contract Documents in accordance with the Contract Documents within sufficient time so as not to delay performance of the Project and within the time stated in the Contract Documents. Notwithstanding any general approval granted by Contractor or Owner, all work shall be in accordance with the Contract Documents. Contractor's processing of shop drawings, cuts, samples and material lists is only for the convenience of the Owner in following the work and shall not relieve the Subcontractor from responsibility for any deviations from the requirements of the Contract Documents. No substitutions shall be made in the Subcontractor's Work unless permitted in the Contract Documents and only then after first receiving all necessary approvals required under the Contract Documents for substitutions.

e. **Inspection and Acceptance**. Subcontractor at its cost shall provide appropriate facilities at all reasonable times for inspection by Contractor or Owner of the work and materials provided under this Subcontract, whether at the Project site or at any place where such work or materials there may be in preparation, manufacture, storage, or installation. Subcontractor shall promptly replace or correct any work or materials which Contractor or Owner shall reject as failing to conform to the requirements of this Subcontract. The work shall be accepted according to the terms of the Contract Documents. Unless otherwise agreed in writing, entrance and use by Owner or Contractor shall not constitute acceptance of the work.

3.  **Payment**.

a. Partial payments shall be due Subcontractor in the amount of 90% of the work in place for which payment has been made to Contractor by Owner. If the Contract Documents allow Contractor partial payments for stored materials, partial payments shall also be due Subcontractor in the amount of 90% of stored materials for which payment has been made to Contractor by Owner. Subcontractor shall submit to Contractor a Certificate of Insurance and a Bill of Lading for stored materials before payment will be made. Prior to the start of the Subcontractor's work, Subcontractor shall submit a breakdown of the total Subcontract price on Contractor's standard schedule of values. Such breakdown shall include for each part of Subcontractor's work a separate value for labor and material. If the work involves renovation services (i.e., services involving the making of permanent improvements or betterments to increase the value of, and appreciably prolong the life of an existing building or structure), Subcontractor's price breakdown shall separately state all charges associated with ............. renovation services. If the Work involves not only renovation services, but also new construction services (i.e., services involving the construction of new buildings or structures or new additions to existing buildings or structures), Subcontractor's price breakdown shall separately state all charges associated with such new construction services, as well as all charges associated with renovation services. In the event Contractor disapproves said breakdown, Contractor shall establish a reasonable breakdown which shall serve as the basis for partial payments. No payment shall be required to be made which will reduce the contract balance below the sum which, in the opinion of the Contractor, will be adequate to fully cover the cost of completing the work and the cost of corrective work due to the Subcontractor's negligent act, error, or omission.

b. Subcontractor shall submit all Requisitions to the Contractor's main office, no later than the 25th day of the calendar month during which the Work covered by that Requisition shall have been performed. Said requisition shall cover all work performed through the 25th day of that month. All billings must be submitted on Requisition forms and must be accompanied by all documents specified hereunder or required by Owner or Owner's lender. Requisitions not submitted on the appropriate forms will be rejected. Prior to commencing work, Subcontractor must supply Contractor with its Sales and Use Tax Identification Number and this number must be shown on all monthly Requisitions. All Requisitions submitted must identify sales tax based on the laws where the job is located. Subcontractor shall also submit with each payment application a partial waiver of lien in a form acceptable to Contractor or Owner. In addition, Subcontractor shall submit, prior to release of payment, including the first payment, unconditional partial waivers of lien in favor of the Contractor and Owner from each person or firm who has supplied material or services to Subcontractor for this project. In the event Subcontractor fails to submit the documents required by this subparagraph, Contractor may withhold any payment due Subcontractor under this Agreement until such documents are submitted. Subcontractor further agrees to furnish any certificates or documents regarding payment and waivers as any lender or the Owner may reasonably request.

c. Partial and final payments will be made following receipt of payment from Owner to Contractor on account of Subcontractor's work. Receipt of payment by the Contractor from the Owner shall be a condition precedent to the right of the Subcontractor to receive payment unless the failure to have received payment shall be solely caused by the fault of the Contractor. Subcontractor hereby agrees to bear the risk of Owner insolvency. Subcontractor further agrees that the liability of the surety on Contractor's payment bond, if any, for payment to the Subcontractor is subject to the same conditions precedent as are applicable to the Contractor's liability for payment to the Subcontractor. No partial payment made under this Subcontract shall be considered an acceptance of the work in whole or in part. All material and work covered by partial payments shall become the property of Contractor, or, if the Contract Documents so provide, the property of Owner; however, this provision shall not relieve Subcontractor from the sole responsibility and liability for all work and materials upon which payments have been made until final acceptance thereof by Owner.

d. Subcontractor shall insure that all sub-subcontractors, employees and suppliers, at all times, are paid all amounts due in connection with the performance of the Subcontract. Subcontractor shall not use any payment received by Subcontractor from Contractor for any purpose other than to satisfy indebtedness incurred in the performance of this Subcontract. Contractor shall have the right to at any time contact the Subcontractor's sub-subcontractors and suppliers for the purpose of verifying that Subcontractor's payment obligations are being met. In the event Contractor has reason to believe the

**Payment (Continued)**

Subcontractor is not fulfilling its payment obligations, Contractor may take any steps necessary to insure that progress payments are utilized to pay such obligations, including, but not limited to, the right to withhold out of subsequent progress payments a reasonable amount to protect Contractor from any and all claims, loss or damage, including attorney's fees, arising out of any claim or lien, until Subcontractor submits evidence satisfactory to Contractor that all previous amounts owed in connection with the performance of this Subcontract, or any other contractual arrangements between the parties, have been paid.

Subcontractor shall also immediately reimburse Contractor for any amounts paid, including costs and attorney's fees, by Contractor or under Contractor's payment bond, if any, in connection with this Subcontract caused by Subcontractor's failure to make payments as provided in this paragraph.

e.   Final payment shall be made the sooner of written acceptance by Owner and any tenant of Owner of subcontractor's work, or 90 days after the entire project is complete; provided, that such payment shall not be due until (1) Subcontractor has provided satisfactory proof of payments of all amounts owed by Subcontractor in connection with the Project, (such proof to include, but not be limited to, a summary of all charges for goods and services associated with the Work performed by Subcontractor, that are subject to sales tax and the taxes paid on such goods and services), (2)  Contractor has been paid in full for the entire Project, and (3) Subcontractor has provided the documentation required by paragraphs 11 (a) and 12.

f.   At the time this Subcontract Agreement is executed and prior to Subcontractor starting work, he shall provide Contractor with a copy of its valid and current Competency License required by Chapter 489 Florida Statutes and/or local ordinances where applicable such as Chapter 10 of the Code of Metropolitan Dade County and Chapter 19 of the Broward County Code.  No payments will be released to Subcontractor until a valid and current Competency License as required herein has been provided to Contractor.

4.   **Subcontractor's Investigations and Representations.**   Subcontractor represents that it is fully qualified to perform this Subcontract, and acknowledges that, prior to the execution of this Subcontract, it has by its own independent investigation verified the work required by this Subcontract and the conditions involved in performing the work.

5.   **Subcontractor's Liability.**
a.  Subcontractor hereby assumes the entire responsibility and liability for all work, supervision, labor and materials provided hereunder, whether or not erected in place, and for all plant, scaffolding, tools, equipment, supplies and other things ...ovided by Subcontractor until final acceptance of the work by Owner.  In the event of any loss, damage or destruction thereof from any cause arising out of the Subcontractor's fault or negligence, Subcontractor shall be liable therefore and shall repair, rebuild and make good said loss damage or destruction at Subcontractor's cost.

b.  Subcontractor shall be liable to Contractor for all costs Contractor incurs as a result of Subcontractor's failure to perform this Subcontract in accordance with its terms.  Subcontractor's failure to perform shall include the failure of its suppliers and/or subcontractors of any tier to perform or comply with any law, rule, code or regulation governing the work.  Subcontractor's liability shall include, but not be limited to (1) damages and other delay costs payable by Contractor to Owner; (2)  Contractor's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays or improper Subcontractor work; (3) warranty and re-work costs; (4) liability to third parties, and (5) attorney's fees and related costs incurred by Contractor in any proceeding against Subcontractor or its sureties to enforce any of Contractor's rights as provided herein.

c.  In the event that Subcontractor or any of its agents, employees, suppliers, or lower-tier subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items belonging to or under the control of Contractor, Subcontractor shall be liable to Contractor for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be due solely to the negligence of Contractor's employees operating Contractor-owned or leased equipment.

d.  Contractor is hereby given the right to withhold amounts otherwise due under this subcontract or any other contractual arrangements between the parties to cover any costs or liability Contractor has incurred or may incur for which Subcontractor may be responsible hereunder.

e.  Subcontractor's assumption of liability is independent from, and not limited in any manner by, the Subcontractor's insurance coverage.

g.  Subcontractor shall be responsible for calculating and remitting all sales or other taxes due and payable on all goods and services which are subject to tax and are associated with the Work performed by Subcontractor, its agents, or employees, and all sub-subcontractors.  Subcontractor shall indemnify, defend and hold harmless Contractor (including its affiliates, parents and subsidiaries), Owner and Architect, and all of their agents and employees from and against all claims, damages, loss and expense, including but not limited to, attorneys' fees, arising from the failure of Subcontractor, its agents, or suppliers, and all sub-subcontractors, to comply with their respective sales tax obligations both hereunder and under the laws of the State having jurisdiction over the work.

Bombardier's Hangar Expansion / Agreement #98009-18
Page Four of Fifteen

6.      **Indemnification.**

   a. Subcontractor shall indemnify, defend and hold harmless Contractor (including its affiliates, parents and subsidiaries), Owner and Architect, and all of their agents and employees from and against all claims, damages, loss and expense, including, but not limited to, attorney's fees, arising out of or resulting from the performance of the Subcontractor's work attributable to bodily injury, sickness, disease or death, or to injury or destruction of tangible property, including the loss of use resulting therefrom, to the extent caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, regardless of whether it is caused in part by a party indemnified hereunder. It is hereby acknowledged that $100.00 of the contract sum, and other valuable consideration is paid in exchange for the indemnification described herein.

   b. This indemnification obligation shall not be construed to negate, or abridge or otherwise reduce any other right or obligation of indemnity, which would otherwise exist as to any party or person described in this Article 6.

   c. In any and all claims against the Owner, the Architect, the Contractor (including its affiliates, parents and subsidiaries) and other contractors or subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under this Article 6 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

   d. The obligations of the Subcontractor under this Article 6 shall not extend to the liability of the Architect, its agents or employees, arising out of (a) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or (b) the giving of or the failure to give directions or instructions by the Architect, its agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

7.      **Subcontractor's Insurance.**

   a. Prior to the start of the Subcontractor's Work, the Subcontractor shall procure for the Subcontractor's Work and maintain in force Worker's Compensation Insurance, Employer's Liability Insurance, Comprehensive General Liability Insurance, Excess Liability (umbrella), and all Insurance required by the Contract Documents, by a carrier(s) approved by the Contractor.

   b. The Contractor and the Owner(s) shall be named as additional insured on each of these policies except for Worker's Compensation. This insurance shall include Contractual Liability insurance covering the Subcontractor's obligations under ....... de.

   c. The Subcontractor's Comprehensive General and Automobile Liability Insurance, and Excess Liability shall be written with limits of liability not less than the following:

| | | | |
|---|---|---|---|
| A. | Comprehensive General Liability including Completed Operations. | | |
| | 1. Bodily Injury | $1,000,000 | Each Occurrence |
| | | $1,000,000 | Aggregate |
| | 2. Property Damage | $1,000,000 | Each Occurrence |
| | | $1,000,000 | Aggregate |
| B. | Comprehensive Automobile Liability Combined Single Limit | $1,000,000 | Each Occurrence |
| C. | Excess Liability | $1,000,000 | Each Occurrence |
| | | $1,000,000 | Aggregate |

   d. The Subcontractor shall maintain in effect all insurance coverage required under this Agreement and the Contract Documents at the Subcontractor's sole expense and with insurance companies licensed to do business in the locale of the project. The requirements stated in this Agreement are minimum requirements. If any of the Contract Documents require greater limits or types of insurance, the requirements stated in the Contract Documents should be followed. All insurance policies shall contain a provision that the coverages afforded thereunder shall not be canceled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to the Contractor unless otherwise specifically required in the Contract Documents. Certificates of Insurance or certified copies of policies acceptable to the Contractor shall be filed with the Contractor prior to the commencement of the Subcontractor's Work. In the event the Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, the Contractor may purchase such coverage and charge the expense thereof to the Subcontractor, or terminate this Agreement.

   e. The Contractor and Subcontractor waive all rights against each other and the Owner, the Architect, separate contractors, and all other subcontractors for loss or damage to the extent covered by Builder's Risk or any other property or equipment insurance, except such rights as they may have to the proceeds of such insurance; provided, however, that such waiver shall not extend to the acts of the Architect listed in Article 6.d.

8. **Time of Performance and Manpower.**

a. Subcontractor will proceed with the work in a prompt and diligent manner, in accordance with Contractor's schedule as reasonably amended from time to time, or as reasonably directed by the Contractor's authorized representative. TIME IS OF THE ESSENCE.

b. If requested by Contractor, Subcontractor shall submit a detailed schedule for performance of the Subcontract, in a form acceptable to Contractor, which shall comply with all scheduling requirements of the Contract Documents and with Article 8.a. above.

c. Subcontractor will coordinate its work with the work of Contractor, other subcontractors, and Owner's other builders, if any, so no delays, interference, or interruption will occur in the completion of any part or all of the Project.

d. If the Contract Documents provide for liquidated damages, or if Contractor shall be held liable to Owner for delays beyond the project completion date, then Subcontractor shall be liable to Contractor for the proportionate share of such damages resulting from delays caused by Subcontractor.

e. Subcontractor shall at all times supply a sufficient number of skilled workers and supervision to perform the Work covered by this Subcontract in accordance with Contractor's schedule, or as directed by the Contractor's authorized representative. In the event Subcontractor fails to supply sufficient manpower to comply with Contractor's schedule, Contractor has the right upon 24 hours notice to supplement Subcontractor's forces with additional skilled workers and to deduct the cost of same from payments due Subcontractor. This right of Contractor to supplement subcontractor's manpower is in addition to all other rights or remedies of Contractor contained in this Subcontract and may be exercised upon 24 hours notice notwithstanding the provisions of Article 14.

9. **Changes and Claims.**

a. Contractor may, at any time, unilaterally or by agreement with Subcontractor, and without notice to the sureties, make changes including additions and deletions, in the work covered by this Subcontract. Any unilateral order, or agreement, under this Article 9.a. shall be in writing. Subcontractor shall perform the work as changed without delay, provided Subcontractor has received a written order from Contractor to proceed with the changed work, unless an emergency requires Subcontractor to proceed without a written order.

In the event Contractor and Subcontractor cannot agree upon the addition or deletion to the Subcontract price or time caused change, the Subcontractor shall proceed promptly with the work. If Subcontractor intends to make a claim for extra compensation or time as a result of such change, it must, prior to proceeding with the work associated with the change, provide Contractor with a written notice that it is proceeding with the changed work under protest. Subcontractor is barred from pursuing any and all claims for which a written notice of protest has not been provided.

b. Subcontractor shall submit in writing to Contractor all claims for adjustment in the Subcontract price or schedule, including an itemization of the damages and time claimed, within fourteen days after the start of the occurrence giving rise to the claim (unless Contractor allows additional time for the submission of data or the Contract Documents provide for a shorter time). No claim for an adjustment in the contract time or price shall be valid if not submitted in accordance with this Article 9 and shall be barred if not so submitted.

c. Adjustments in the Subcontract price resulting from changes, shall be set forth in a Subcontract Change Order. Subcontractor shall receive a mark-up of 10% for combined overhead and profit on the direct costs of materials and labor associated with any change, provided such costs are agreed to by Contractor.

d. Subcontractor acknowledges that delays resulting from changes in the work, extreme weather, changes to the sequencing of the work, material shortages, transportation, strikes and other causes are inherent in the construction process. Subcontractor acknowledges that it has accounted for delays in its prices and agrees to bring no claims for money damages as a result of any delay or hindrance. In the event that Subcontractor claims that it has been delayed or hindered, it shall submit a request for a time extension to Contractor in the manner and pursuant to the time periods set forth in the Contract Documents. If it is determined that Subcontractor has been delayed or hindered through no fault of its own, the time for performance hereunder will be extended and the extension of time will be Subcontractor's sole remedy for the delay. Under no circumstances will the Contractor or Owner be liable to the Subcontractor for damages resulting from any delays or hindrances.

10. **Settlement of Disputes.**

a. Notwithstanding any other provision of this Subcontract (including without limitation paragraph 2.b) or the Contract Documents to the contrary, no dispute or claim of any nature arising out of or relating to this Subcontract will be subject to arbitration. In the event Contractor and Subcontractor cannot resolve disputes, either party may prosecute its claim in a court of competent jurisdiction within the State of Florida. All suits must be brought in the courts of Florida and must be commenced within one year of the date Subcontractor substantially completes its work, otherwise the claim will be deemed to have been waived. In the event of an arbitration between Owner and Contractor, and at the sole option of Contractor, Subcontractor may be joined in such arbitration. Subcontractor shall include a similar provision in its Sub-subcontracts.

11. **Warranty.**

a. Subcontractor warrants its work hereunder to Contractor on the same terms, and for the same period, as Contractor warrants the work to Owner under the Contract Documents; and with respect to Subcontractor's work, Subcontractor shall perform all warranty obligations and responsibilities assumed by Contractor under the Contract Documents. If no guarantee or warranty is required by the Contract Documents, then the Subcontractor shall guarantee or warranty its work against all

Warranty (continued)
deficiencies and defects in materials and/or workmanship for one (1) year from the date of substantial completion of all or a designated portion of the Project. The Subcontractor shall furnish "as-built" or record drawings in reproducible form, copies of warranties and guarantees from its suppliers and subcontractors, and operation and maintenance manuals for all equipment furnished hereunder.

12. **Liens.**
a. In the event that liens are filed by anyone in relation to the labor and/or material being furnished by Subcontractor, Subcontractor agrees to have the same discharged, by posting a bond with the appropriate authorities, or otherwise, within five (5) days of notice. In the event such lien is not so discharged, Contractor shall have the right to discharge said lien and recover from Subcontractor all costs associated therewith as provided in paragraph 3.d.

b. At the time final payment is made, Subcontractor shall provide to Contractor a general release of all claims in connection with its performance of this Agreement. Final payment will not be due until said general release and any documents, waivers, or certificates required by Owner's lender are provided. Additionally, prior to the making of final payment, Subcontractor shall provide Contractor with evidence satisfactory to Contractor that there are no outstanding liens or claims outstanding against the Work.

c. The Subcontractor covenants and agrees that no mechanics' liens or claims will be filed or maintained against the Project and its premises or any part thereof or any interests therein or any improvements thereon, or against any monies due or to become due from the Owner to Contractor or from Contractor to the Subcontractor, for or on account of any work, labor, services, materials, equipment or other items performed or furnished in connection with the Work, and the Subcontractor does hereby expressly waive, release and relinquish all rights to file or maintain any such mechanic's liens and claims and agrees further that this waiver of the right to file or maintain mechanics' liens and claims shall be an independent covenant and shall apply as well to work, labor and services performed and materials, equipment and other items furnished under any change order or supplemental agreement for extra or additional work.

13. **Termination for Convenience.** The Contractor shall have the right at any time, on not less than five (5) days notice to the Subcontractor, to terminate this Agreement without cause and/or for the Contractor's convenience. Upon receipt of such notice of termination, the Subcontractor shall immediately discontinue the Work and remove its equipment and employees from the site. In the event of termination under this paragraph, the Subcontractor shall have the right, at its sole and exclusive remedy, to recover from the Contractor payment for all Work executed and costs incurred up to the date of termination (less any payments theretofore made to the Subcontractor by the Contractor on account thereof) and for any proven loss of reasonable profits sustained on that portion of the Work executed prior to termination (less any payments theretofore made to the Subcontractor by the Contractor on account thereof); provided, however, that in no event shall the amount recovered by the Subcontractor from the Contractor as aforesaid exceed a greater percentage of the Contract Price than the percentage of Work completed through the date of termination or any sum Contractor might recover from Owner in the event Contractor's contract has been terminated by Owner. All indemnities and all warranties shall survive the termination of the Contract.

14. **Subcontractor's Failure to Perform and Termination for Cause.**
a. If, in the opinion of Contractor, Subcontractor shall at any time (1) refuse or fail to provide a sufficient number of properly skilled workmen, adequate supervision or materials or the proper quality, (2) fail in any respect to prosecute the work according to the current schedule or as directed by Contractor, (3) cause, by any action or omission, the stoppage, or delay of, interruption or interference with the work of Contractor or of any other builder or subcontractor, or (4) fail to comply with any provisions of this Subcontract or the Contract Documents, then, after serving three (3) business days written notice, unless the condition specified in such notice shall have been eliminated within such three (3) days, the Contractor may at its option (i) without voiding the other provisions of the subcontract and without notice to the sureties, take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to Contractor for the cost thereof, or (ii) terminate the Subcontract for default. In the event of termination for default, Contractor may, at its option, (1) enter on the premises and take possession, for the purpose of completing the work, of all materials and equipment of Subcontractor, (2) require Subcontractor to assign to Contractor any or all of the subcontract or purchase orders involving the project or (3) complete the work either by itself or through others, by whatever method Contractor may deem expedient. In case of termination for default, Subcontractor shall not be entitled to receive any further payment until the work shall be fully completed and accepted by Owner. At such time, if the unpaid balance of the price to be paid shall exceed the expense incurred by Contractor, such excess shall be paid by Contractor to Subcontractor. If such amount due Contractor shall exceed such unpaid balance, then Subcontractor shall pay Contractor the difference within five (5) business days following demand by Contractor. Subcontractor shall pay all reasonable costs of collection, including a reasonable attorney's fee, if any.

b. If Contractor wrongfully exercises any option under Article 14.a (i) or (ii) above, such exercise shall be deemed a Termination for Convenience and the Subcontractor compensated as provided for in Article 13 hereof.

15. **Subcontractor's Bankruptcy or Insolvency.**
a. Upon the appointment of a receiver for the Subcontractor or upon the Subcontractor making an assignment for the benefit of creditors, the Contractor may terminate this Agreement giving three (3) business days written notice, by certified mail, to the Subcontractor and its surety, if any. If an order for relief is entered under the bankruptcy code with respect to the

Subcontractor's Bankruptcy or Insolvency (continued)
Subcontractor, the Contractor may terminate this Agreement by giving three (3) business days written notice, by certified mail, to the Subcontractor, its trustee, and its surety, if any, unless the Subcontractor, the surety, or the trustee:

( i )    promptly cures all defaults;
( ii )   provides adequate assurances of future performance;
( iii )  compensates the Contractor for actual pecuniary loss resulting from such defaults, and
( iv )   assumes the obligations of the Subcontractor within the statutory time limits.

b.  If the Subcontractor is not performing in accordance with the Schedule of Work at the time of entering an order for relief, or at any subsequent time, the Contractor, while awaiting the decision of the Subcontractor or its trustee to reject or to accept this Agreement and provide adequate assurance of its ability to perform hereunder, may avail itself of such remedies under this Article as are reasonably necessary to maintain the Schedule of Work. The Contractor may offset against any sums due or to become due the Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorney's fees. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the contract price.

16.   Safety Requirements.  In order to help assure the safety of all workers and the orderly progression of work, the following are to be considered basic safety requirements for all personnel on this project. These requirements are not intended to be all inclusive and may need to be amended, supplemented, or changed to meet specific project conditions such as the nature of the work and such other rules as required by the customer.

The Subcontractor agrees in the performance of this contract to observe and comply with the following requirements (in addition to other contractual safety requirements):

a.  All applicable federal, state, local, or other regulatory agency's safety rules and regulations including, but not limited to, the Occupational Safety & Health Act of 1970, as amended.

b.  The Subcontractor agrees to observe and comply with the Konover Construction Corporation South Project Safety Plan in effect. Subcontractors are encouraged to develop their own project safety plan that promotes safety awareness among its employees.

c.  Maintain safe and healthful working conditions.

d.  Provide required mechanical safeguards and personal protective equipment.

e.  Insist that employees comply with established safety regulations and practices, and the proper wearing and use of all safety equipment provided. Hard hats are required at all times. Safety glasses with side shields must be worn when any condition exists that poses a potential risk for eye injury. Canvas shoes, jogging shoes, or sneakers are prohibited. "Steel-toe" safety shoes are recommended.

f.  All areas of the project, with special emphasis on passageways, flammable or combustible storage areas, as well as areas around ladders, stairs and ramps, will be maintained in a clean and orderly condition at all times — good housekeeping is everyone's job.

g.  All work in elevated areas (including staging) requires adequate fall protection in the form of railings, safety belts, or the equivalent. All staging will be adequately braced and ladders will be secured in place. Safe access (a ladder or equivalent) will be provided to all elevated work areas.

h.  Lockout procedures will be used whenever employees could be harmed by an accidental start-up.

i.  Confined Area Entry Procedures will be used before work is conducted in any location, which may be subject to an oxygen deficiency or the buildup of harmful fumes.

j.  Open areas and floor holes, which could create a fall hazard, will be properly guarded, barricaded, or covered. These safety precautions will be the responsibility of the party creating the hazard.

k.  Unless adequate protective devices have been installed, work will not be performed overhead where falling tools or materials could cause a hazard to those below.

l.  All electrical wiring and powered equipment must be installed in a workmanlike manner and maintained in good condition. All electrical tools will be grounded or double insulated.

m.  Only trained, authorized people will operate or service equipment. Equipment will be operated only in accordance with the manufacturer's recommendations.

n.  The use, possession, or sale of alcohol or other drugs is prohibited. Those who are believed to have used, or are under the influence of drugs or alcohol, will be removed from the project.

Bombardier Hangar Expansion / Agreement #98009-10
Page Eight of Fifteen

Safety Requirements (Continued)
o.  Maintain a continuous educational program in safe operating procedures.
    1.  Weekly safety meetings will be conducted by each subcontractor for their personnel.
    2.  Subcontractors are encouraged to conduct safety training prior to each new phase or operation.

p.  No radios or headphones allowed on the project.

q.  As per Hazard Communication Standard issued recently by OSHA, Subcontractor is required to submit Safety Data Sheets to the superintendent on the jobsite. A copy must also be sent to the Safety Director of Konover Construction South.

r.  Subcontractor is required by OSHA to train their employees in the proper usage and disposal of hazardous materials, which might be used on the Jobsite.

s.  Subcontractor is required by OSHA to have a written program in Hazardous Communication and a written Safety Program. Copies of these programs are to be sent to the Safety Director of Konover Construction South prior to going on site.

t.  Violation of these rules and regulations may result in termination of the Subcontract Agreement.

u.  Clean-up - Subcontractor shall keep the construction area, including storage areas used by him, at all times free from Subcontractor's rubbish, waste material, excess materials, equipment, and debris, and each day shall remove from the site, or to a specified location on the site as may be directed by the Contractor, any such rubbish, waste material and debris, and prior to completion of work, shall remove all tools, scaffolding, equipment and materials used by Subcontractor and not incorporated into the completed work and shall leave Subcontractor's work "broom clean" and free and clear of all obstruction and hindrance. If the Subcontractor fails to so remove Subcontractor's rubbish, waste material, etc., after 24 hours notice, then the Contractor shall have the right to remove same and charge the cost thereof against monies due or to become due the Subcontractor.

v.  The Subcontractor shall follow the Contractor's safety directions. If the Subcontractor fails to immediately commence compliance with such safety duties within 24 hours after receipt from the Contractor of written notice of noncompliance, the Contractor may implement such safety measures without further notice and deduct the cost thereof from any amounts due or to become due the Subcontractor.

w.  Subcontractor agrees to have a representative present at all scheduled job and safety meetings held while Subcontractor performing work. Unless otherwise excused from attendance at such meetings by Contractor, Subcontractor hereby consents to a reduction in payment of $100.00 for each and every failure to attend job meetings; provided that such reduction will only be applied subsequent to Subcontractor receiving one written warning regarding its failure to attend such meetings.

x.  Due to increased safety violations on projects and Konover Construction Corporation South's concern for the safety of all who work on our projects, and also due to OSHA's step-up on their programs where General Contractors are held responsible for the safety on the project; and whereby the General Contractor can be cited for Subcontractor violations, we are implementing a stricter enforcement policy on all projects. Below is a list of violations and penalties associated with them. Fines will be imposed after Subcontractor has received one written warning for any infraction.

| No. | Violation | Amount | Type |
|---|---|---|---|
| 1. | No hard hats. | $100.00 | fine per violation |
| 2. | Failure to replace guard rails/barricades. | $500.00 | fine |
| 3. | Failure to replace a floor opening cover or failure to notify Konover Construction when creating a new opening. | $1,000.00 | fine |
| 4. | Failure to use guardrails or to use safety harness and lanyards where required by OSHA standards. | $500.00 | fine |
| 5. | Temporary electrical panels, G.F.C.I., lights not maintained; also leaving live panels open and unattended. | $1,000.00 | fine to electrical subcontractor |
| 6. | No work shoes. | $100.00 | fine per violation |
| 7. | Damaged cord, cords without ground pins; cords not meeting OSHA standards. | $100.00 | fine per violation |
| 8. | Failure to clean where rubble is left that can create an accident. | $500.00 | fine |
| 9. | Failure to attend safety meeting or failure to hold own safety meeting each week and submit copy of such meeting to Konover Construction South. | $100.00 | fine |
| 10. | Failure to comply with any other Loss Control rules. | $100.00 - $500.00 | fine per violation |

17.  **Assignment.** Subcontractor shall not sub-subcontract the work of the Subcontract and shall not assign or transfer this subcontract, or funds due thereunder, without the prior written consent of Contractor and Subcontractor's surety.

18.  **Patents and Royalties.** Except as otherwise provided by the Contract Documents, Subcontractor shall pay all royalties and license fees, which may be due on the inclusion of any patented materials in the work. Subcontractor shall defend all suits or claims for infringement of any patent rights that may be brought against Contractor or Owner arising out of the work, and shall be liable to Contractor and Owner for all loss, including all costs and expenses, on account thereof.

19.  **Taxes and Permits.** Except as otherwise provided by the Contract Documents, Subcontractor agrees to pay and comply with and hold Contractor harmless against the payment of all contributions, taxes or premiums which may be payable by it under Federal, state or local laws arising out of the performance of this Subcontract, and all sales, use or other taxes of whatever nature levied or assessed against Owner, Contractor, or Subcontractor arising out of this Subcontract, including any interest or penalties. Subcontractor shall obtain and pay for all permits, licenses, fees and certificates of inspection necessary for the prosecution and completion of its work and shall furnish copies of same to the Contractor.

20.  a.  **Laws, Regulations and Ordinances.**
Subcontractor agrees to be bound by, and, at its own cost, comply with all federal, state and local laws, codes, ordinances and regulations applicable to this Subcontract and the performance of the work hereunder including, but not limited to, tax laws, social security acts, unemployment compensation acts, workers compensation laws, affirmative action laws and the Occupational Safety and Health Act of 1970. Subcontractor shall be duly licensed to operate under the law of the applicable jurisdictions. Subcontractor shall be liable to Contractor and Owner for all loss, cost and expense attributable to any acts of commission or omission by Subcontractor, its employees and agents resulting from failure to comply including, but not limited to, fines, penalties or corrective measures. Contractor strictly enforces the positions of the Immigration Reform and Control Act of 1986 and requires all Subcontractors to do the same.

b.  **Communication of Hazards.** Subcontractor shall and shall insure that its agents, employees, and suppliers, and all sub-subcontractors, comply with all applicable standards (hereinafter "The Standards") of ( i ) the Occupational Safety and Health Standards Subpart Z - Toxic and Hazardous Substances Hazard Communication Standard, created pursuant to 29 U.S.C. 655 of the Occupational Safety and Health Act, as amended from time to time, including, but not limited to, the requirements for multi-employer workplaces stayed on June 24, 1988 by the United States Court of Appeals for the Third Circuit in *Associated Builders and Contractors, Inc. v. Secretary of Labor*, including but not limited to, reporting, record keeping and training requirements regarding the transmittal, use and storage of any hazardous material for use on the Project, and ( ii ) the Comprehensive Environmental Response, Compensation and Liability Act; the Superfund Amendment and Reauthorization Act, including the Emergency Planning and Community Right-To-Know Act as amended from time to time. Subcontractor assumes sole responsibility for failure of it, its agents, employees, and suppliers and all sub-subcontractors to comply with the Standards and all consequences of such failure. Copies of any forms, documents, or writings required to be submitted, filed, maintained, posted against Subcontractor or its sureties to enforce any of Contractor's rights as provided herein; and all costs of compliance, expenses and damages, including but not limited to, fines or penalties assessed against Contractor incurred as a result of violations of Section 20 (b) by Subcontractor, its agents, employees, and suppliers and any sub-subcontractors.

21.  **Labor.** In the event that Subcontractor or any of its agents, employees, suppliers, or lower-tier subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items belonging to or under the control of the Contractor, Subcontractor shall be liable to Contractor for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be due solely to the negligence of Contractor's employees operating Contractor-owned or leased equipment.

a.  There shall be no manifestations on the project of any dispute between any labor organization and the Subcontractor. The Subcontractor agrees to employ workers, agents, suppliers and subcontractors who will perform the work under this Subcontract whether or not other employees or mechanics on the project are members or non-members of any labor or collective bargaining organization.

b.  If the Subcontractor has any intention of obtaining sub-subcontractor(s) to work at this project, the Subcontractor must provide a written submittal stating the sub-subcontractor(s) name, address and completion date. This information must be approved prior to the sub-subcontractor(s) commencing work. The sub-subcontractor(s) is also required to obtain and maintain all the insurance requirements stated in Article 7, a through e, of this Subcontract. The Subcontractor must submit regular up-to-date lists of their sub-subcontractor(s) working at this project.

c.  Should any workers performing work covered by this Subcontract engage in a strike or other work stoppage or cease to work due to picketing or a labor dispute of any kind, Contractor may, at its option and without prejudice to any other remedies it may have, after twenty-four (24) hours written notice to Subcontractor, provide any substitute labor as may be required and deduct the cost thereof from any monies due or thereafter to become due Subcontractor; and further, Contractor may at its option, without prejudice to any other remedies it may have, terminate the employment of Subcontractor for the work under this Subcontract, and shall have the right to enter upon the premises and take possession for the purpose of completing the work either with its own employees or other Subcontractors; and in case of

Bombardier Hangar Expansion / Agreement #98009-10
Page Ten of Fifteen

21.   **Labor  (Continued)**
such termination of the employment by Contractor, Subcontractor shall not be entitled to receive any further payments under the Subcontract or otherwise but shall nevertheless remain liable for any damages, which Contractor incurs. If the expenses incurred by Contractor in completing the work shall exceed the unpaid balance due Subcontractor, Subcontractor shall pay the difference to Contractor together with any other damages incurred by Contractor as the result of Subcontractor's default. Contractor shall have a lien upon all materials, tools, and appliances taken possession of, to secure the payment thereof.

d.  Contractor is hereby given the right to withhold amounts otherwise due under this subcontract or any other contractual arrangements between the parties to cover any costs or liability Contractor has incurred or may incur for which Subcontractor may be responsible hereunder.

e.  Subcontractor's assumption of liability is independent from, and not limited in any manner by, the Subcontractor's insurance coverage obtained pursuant to Article 7, or otherwise.

f.  Subcontractor shall also indemnify, defend and hold harmless Contractor (including its affiliates, parents and subsidiaries), Owner and Architect, and all of their agents and employees from and against all claims, damages, loss and expense, including but not limited to, attorneys' fees, arising from the failure of Subcontractor, its agents, suppliers, or employees, and all sub-subcontractors, to comply with Section 20 (b) hereof.

g.  Subcontractor shall be responsible for calculating and remitting all sales taxes due and payable to revenue authorities having jurisdiction over the Project on all goods and services, which are subject to sales tax and are associated with the Work performed by Subcontractor, its agents, or employees, and all sub-subcontractors.  Subcontractor shall indemnify, defend and hold harmless Contractor, (including its affiliates, parents and subsidiaries), Owner and Architect, and all of their agents and employees from and against all claims, damages, loss and expense, including but not limited to, attorney's fees, arising from the failure of Subcontractor, its agents, or suppliers, and all sub-subcontractors, to comply in this respect.

22.   **Notices.**  All notices shall be addressed to the parties at the addresses set out herein, and shall be considered as delivered when postmarked, if dispatched by registered mail, or when received in all other cases.

23.   **Severability and Waiver.**  The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision.  The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

24.   **Advertising.**  Neither Subcontractor, its subcontractors, suppliers nor employees shall take photographs of the work on site, or publish or display advertising matter of any description relating to the Project without first obtaining the written consent of Contractor and the Owner.

25.   **Bond.**  The Subcontractor shall, if required by the Contractor, furnish at Contractor's expense a Performance and Payment Bond, in the full amount of this Subcontract.  The bond form and the surety shall be acceptable to the Contractor.

26.   **Complete Agreement.**  This Subcontract contains the entire agreement between the parties hereto with respect to the matters covered herein.  No other agreements, representations, warranties, or other matters, oral or written, shall be deemed to bind the parties hereto.

27.   **No Third Party Beneficiary Rights.**  Nothing in this Agreement shall be deemed to create any third party beneficiary relationship between Owner and any Subcontractor.

IN WITNESS WHEREOF, the parties, by their duly authorized representatives, have hereunto executed this Subcontract and any attached Riders, hereinafter included as part of this Subcontract Agreement, on the day and year above written.

SUBCONTRACTOR                                    GENERAL CONTRACTOR

_____                 _____
(Authorized Signatory)                          (Authorized Signatory)

Typed Name: _Joseph Hummel_                      Typed Name:  __Bob Scott__

Title:  __President__                            Title:  _____Project Manager_____

For:   FINE LINE CONSTRUCTION & ELECTRIC, INC.   For:   KONOVER CONSTRUCTION CORPORATION SOUTH

Date:  _12/22/99_                                Date: _____

RIDER "A" - SUBCONTRACTOR'S CLARIFICATION OF WORK
between
KONOVER CONSTRUCTION CORPORATION SOUTH
and
FINE LINE CONSTRUCTION & ELECTRIC, INC.

The following items are a Clarification of the Subcontractor's Work but are in NO WAY meant to limit the Scope of Work and obviously do not list all the items that Subcontractor must perform.

1.   The Subcontractor is to supply labor, material, tools, equipment, transportation, supervision, insurance's and all necessities to complete the ELECTRICAL PACKAGE, per the contract documents, drawings, specifications and field conditions.

All ELECTRICAL systems complete and in accordance with all applicable plans, specifications, contract documents, codes and governing authorities having jurisdiction.
a.   Demolition. Subcontractor shall dismantle and remove any lighting fixtures, control components, conduit, wire, and devices that will not be necessary for the new installation and remove same from job site.
b.   Temporary Facilities. The subcontractor shall provide temporary power. To a location that is to be determined by the Project Superintendent and is of sufficient size and capacity to supply a source of power to the subcontractors for the construction of the hangar and office spaces. Temporary lighting in compliance with current codes is required in the spaces.
c.   Telephone/Data System. Subcontractor shall furnish and install conduits with pull strings in each conduit. Coordinate all installation requirements with Bell South field representative. The subcontractor shall furnish and install conduits (3/4" minimum) for the telephone/data system as required.  Owner shall provide the telephone cable, data cable, and instruments for installation by this subcontractor. Subcontractor shall have the responsibility to pull and install all cabling and must provide proof of certification.
d.   Signs. The subcontractor shall make all the electrical connections and provide disconnects for the exterior signs as required.
e.   Service Conduit. Subcontractor shall furnish and install secondary conduits from transformer to building, including all trenching and backfill. Transformer will be located adjacent to the main hangar building All trenching and backfill shall be performed per F.P.L. and Civil Engineering specifications. Subcontractor shall install pedestal per F.P.L. requirements for installation of electric meter by F.P.L. Subcontract shall coordinate all electric service requirements with F.P.L. Rep.
f.   Fixtures. All Lighting Fixtures and lamps are to be provided per plans & specifications  or approved equal and are to be received, stored and installed with all required connections.  Provide cord, plug and safety wire to ballast and to reflector. All fixtures shall be mounted with stem as high as possible. Verify clearance with bridge crane. Provide structural steel member between purlins to locate fixtures as shown. Temporary electrical power will be supplied. Cutting lay in ceiling tile for recessed lighting fixtures is included. Ceiling support wire and tenting of lighting fixtures, if required is included.  Grounding rods as required. Work to be done in accordance with plans and specifications and local codes.
g.   Fire Alarm. Fire alarm system per plans & specifications or approved equal and shall meet code requirements.  All detectors, alarms and activation devices shall be loop wired for redundancy and where to the required two adjacent devices to concur before system activation. Alarm shall be coordinated with Fire Sprinkler Contractor.
h.   HVAC. All wiring per plans, specifications and field conditions.
i.   Equipment. All panels, disconnects, and service equipment as per the plans and specifications or approved equal. All equipment to be connected as required, including the modification of cards and/or adapters as required by the field conditions. Subcontractor shall replace circuit directories of all existing panels which are reworked during construction. Circuit breakers which have loads removed from them and not re-used shall be labeled "Spare".  Existing loads shown on existing panel schedules were obtained  from original construction documents. Subcontractor shall notify Contractor if breakers to be re-worked for new loads are other than sizes indicated on panel schedules or if breakers serve equipment not removed during demolition phase. Connection for testing (i.e. HVAC, paging system, etc.) is included.
j.   Schedule of equipment delivery dates for work under your scope is required.
k.   Intercom system per plans and specifications  or approved equal including, but not limited to the following:
          1. Speaker zoning and volume control.
          2. System controller with a minimum four auxiliary ports for phone paging interface.
          3. System controller and amplifier components to be rack mounted.
l.   Security system per plans and specs. Or approved equal.
l.   Power and hook ups to hangar door operators (operators provided by others).
m.   Power to and hookup overhead cranes as required.
n.   Power to and hookup fire supply pumps and/or equipment.
o.   Explosion proof fittings in hangar and all other required areas.
p.   Lightning protection per N.F.P.A. 78 and all other applicable codes including all suppression as specified.
q.   PVC Raceways and labor to install 400 hertz system wiring and cables that are supplied by owner.
r.   Power to elevator including lighting in shaft as required.
s.   Power to and hookup paint spray booth as required.
t.   The placement of outlets and devices shall not interfere with fire ratings in partitions and ceilings.
u.   Provide attachment of ceiling wires as required to support light fixtures.
v.   Provide outlets for HVAC damper controls.
w.   Provide 460 VAC, 3 phase receptacles around perimeter of project as required.
x.   All Government prevailing wage requirements are to be met by this subcontractor.
y.   Labor Rates.         Electrician       $ 42 00   per hour
                                  Helper            $ 37 00   per hour
                                  Laborer          $ 32 00   per hour

2. Subcontractor will supply a skilled and knowledgeable foreman to supervise their portion of work and to deal with Contractor's field Superintendent on a daily basis and perform/supervise the following duties:

   a. Fill out a Konover daily construction log, listing the number of men on the job, areas worked, and problems encountered on a daily basis. This log must be submitted to Contractor's field Superintendent daily.
   b. Attend job meetings and have the authority to represent the Subcontractor at these meetings.
   c. Hold weekly safety meetings with the other employees of Subcontractor, and submit to Contractor's field Superintendent on a weekly basis, a signature list of the men attending this safety meeting and describing the discussion.
   d. Assuring Subcontractor's debris is picked up on a daily basis, or more often if deemed necessary by Contractor's field Superintendent, so as to maintain a safe work place for all.
   e. This foreman shall be responsible to assure that all Subcontractor's operations meet or exceed all local, state, or federal safety regulations. This foreman shall deliver to the job trailer and maintain an up-to-date MSDS folder, for all materials, fuels, etc. that will be used by Subcontractor on this project. This foreman will deliver to the job trailer a copy of Subcontractor's Safety Plan, to be kept on file in the job trailer.

3. Subcontractor will provide any required overtime if:
   a.) Material and/or equipment needs to be unloaded and/or staged before or after working hours, and/or;
   b.) Work must be performed on overtime or additional shifts to meet project schedule.

4. Contractor will provide the following temporary facilities and equipment:
   a.) Portable toilets.
   b.) Temporary water supply (hose bib).
   c.) Cost of utility usage.
   d.) Temporary lighting in those work areas of the building normally provided in standard construction practices.

5. Subcontractor will provide all other temporary facilities and equipment required to perform his work which shall include, but not be limited to, the following:
   a.) Hoses to distribute water supply from source.
   b.) Power cords to distribute power.
   c.) All required crane hoisting or other lifting devices.
   d.) All scaffolding, staging , ladders and or safety measures to meet or exceed regulatory requirements.
   e.) Job offices (with power and telephones), storage containers, tool boxes, etc.

6. Contractor will provide a reasonable amount of benchmark elevations (controls). Subcontractor is responsible for all other layout as required to perform their work.

7. If Subcontractor works at night, all required lighting, above what was outlined above, will be furnished, operated and maintained by Subcontractor.

8. It will be Subcontractor's responsibility for all his employees', agents', etc., parking requirements.

9. Contractor will not be charged for any incidental stand-by-time by Subcontractor or any of its agents, sub-subcontractors, suppliers or deliveries.

10. It will be Subcontractor's responsibility to remove from the site any damaged, rejected, surplus or unusable items that will not fit into Contractor's dumpsters. If Subcontractor's waste material is considered hazardous waste, it will be the responsibility of Subcontractor to remove this material from the site and dispose of all hazardous waste materials as required by all applicable regulatory agencies.

11. Subcontractor is responsible to coordinate and schedule with the Project Superintendent all material deliveries, off-loading and stocking plans.

12. All materials used for the project must meet all requirements of the State of Florida, applicable city and county, Project Architect, Project Engineers and Contractor. No substitutions for materials used or installation will occur without written authorization from the Project Manager and/or Contractor.

13. Subcontractor understands that where "provided" is used it shall be understood to mean, "provide complete in place", that is, "furnished and installed, ready for operations or use."

14. Subcontractor is responsible to provide temporary protection of their work from weather, dust, etc. as outlined in the specifications until final acceptance.

15. As built drawings, warranties and operation & maintenance manuals are required and will be supplied within 5 working days of completion of your work and before final close out.

16. The nature of a remodel will require that certain items, (temporary connections, security, disconnects, making safe and temporary closure) are required. This work is difficult to identify but will be required under this contract. In addition off-hour work is anticipated for some portions of this scope. No additional charges for premium time are permitted.

17. Demolition of existing work shall be done in such a manner that it will not interfere with normal operation of the store, and care shall be taken not to damage existing structures, fixtures, etc. Follow OSHA requirements strictly before, during and after each phase of the work and endeavor to protect workers as well as the public using the store from injury. Instruct store management of all planned precautions and enlist employees to strive to continually be aware of and to report hazardous conditions that may result in injury.

**END OF RIDER "A"**

Bombardier Hangar Expansion / Agreement #98009-18
Rider "B" - Page Thirteen of Fifteen
Date: 11/01/99

**RIDER "B"**
**DRAWING & SPECIFICATION LIST**
Between
**KONOVER CONSTRUCTION CORPORATION SOUTH**
And
**FINE LINE CONSTRUCTION & ELECTRIC, INC.**

| Bombardier Hangar Expansion - G98009-01 |
| Ft. Lauderdale, FL |

**SPECIFICATIONS**

Project Specifications dated February 5th, 1998 prepared by Law/Kingdon, Inc. Architects & Engineers, 345 Riverview, Wichita, KS 67203 and their consultants.

**DRAWING LIST**

As prepared by Law/Kingdon, Inc. and their consultants.

| DWG NO. | DESCRIPTION | DATE | REVISION NO. | LATEST REV. DATE |
|---|---|---|---|---|
| T | TITLE SHEET | 11/18/98 | 1,2 | 2/5/99 |
| S-1 | SITE SECURITY PLAN | 1/6/99 | | |
| SL-1 | SITE LIGHTING PLAN | 3/10/99 | 1 | 3/10/99 |
| MISC 1 | BUILDING ELEVATION- BUILDING SECTION | 2/25/99 | | |
| A000 | PROJECT DATA (UL ASSEMBLIES) | 11/18/98 | | |
| | **CIVIL DRAWINGS** | | | |
| C | COVER SHEET | 9/1/98 | | |
| C1 | GEN. NOTES AND SPECIFICATION | 9/1/98 | 1 | 9/16/98 |
| C2 | EXISTING CONDITIONS PLAN | 9/30/98 | | |
| C3 | GEOMETRY LAYOUT PLAN | 10/23/98 | | 3/25/99 |
| C4 | DRAINAGE BASIN BOUNDARY PLAN | 10/13/98 | 1,2,3 | 4/2/99 |
| C5 | PAVING/GRADING/DRAINAGE PLAN | 9/18/98 | 1,2,3 | 4/1/99 |
| C6 | WATER & SANITARY SEWER PLAN | 9/18/95 | 1,2,3,4,5 | 9/16/99 |
| C7 | PAVING/GRADING/DRAINAGE DETAILS | 9/1/98 | 1 | 12/16/98 |
| C8 | PAVING/GRADING/DRAINAGE DETAILS | 11/12/98 | 1,2,3 | 4/1/99 |
| C9 | WATER AND SEWER DETAILS | 9/1/98 | 1,2 | 1/12/99 |
| C10 | WATER AND SEWER DETAILS | 11/12/98 | 1,2 | 9/16/99 |
| C11 | PAVEMENT MARKING & SIGNAGE PLAN | 9/30/98 | 1,2 | 2/3/99 |
| LS 1 | LANDSCAPE PLAN | Aug-98 | 1,2,3,4,5,6 | 7/30/99 |
| LS 2 | LANDSCAPE DETAILS AND NOTES | Aug-98 | 1,2,3,4,5,6 | 7/30/99 |
| IR 1 | IRRIGATION PLAN | 11/18/98 | 1,2,5 | 3/9/99 |
| IR 2 | IRRIGATION NOTES | 11/18/98 | 1 | 2/1/99 |
| IR 3 | IRRIGATION DETAILS | 11/18/98 | | |
| SP-1 | SITE PLAN | 10/23/98 | | 3/9/99 |
| SP-2 | SITE PLAN DETAILS | 10/23/98 | | 2/22/99 |
| | **SITE DRAWINGS** | | | |
| SA-1 | SITE ARCH. PLAN/ FIRE PUMP BLDG. | 11/18/98 | 1,2,3,4,5 | 7/16/99 |
| SA-2 | FIRE PUMP BUILDING/SECT/DETAILS | 11/18/98 | 1,2 | 5/28/99 |
| | **DEMOLITION DRAWINGS** | | | |
| AD-1 | DEMO PLAN 1ST FLOOR | 11/18/98 | 1,2 | 5/28/99 |
| AD-2 | DEMO PLAN 2ND FLOOR | 12/15/98 | 1 | 5/28/99 |

*KW]*

Bombardier Hangar Expansion / Agreement #G98009-1B
Rider "D" - Page Fourteen of Fifteen
Date: 11/01/99

**Bombardier Hangar Expansion - G98009-01**
**Ft. Lauderdale, FL**

### DRAWING LIST    (Continued)

| DWG NO. | DESCRIPTION | DATE | REVISION NO. | LATEST REV. DATE |
|---|---|---|---|---|
| | **ARCHITECTURAL DRAWINGS** | | | |
| A-100 | FIRST FLOOR PLAN | 11/18/98 | 1,2,3,4 | 7/16/99 |
| A-101 | SECOND FLOOR PLAN | 11/18/98 | 1,2,3,4 | 7/16/99 |
| A-102 | FIRST FLOOR REMODEL | 11/18/98 | 1,2,3,4 | 7/16/99 |
| A-103 | SECOND FLOOR RMODEL | 11/18/98 | 1,2,3,4 | 7/16/99 |
| A-104 | FIRST FLOOR NEW | 11/18/98 | 1,2,3,4 | 7/16/99 |
| A-105 | SECOND FLOOR NEW | 11/18/98 | 1,2,3,4 | 7/16/99 |
| A-200 | BUILDING ELEVATIONS | 11/18/98 | 1,2 | 6/17/99 |
| A-201 | BUILDING ELEVATIONS | 11/18/98 | 1,2 | 7/16/99 |
| A-300 | ENLARGED TOILET RMS. | 11/18/98 | 1,2,3 | 7/16/99 |
| A-301 | ENLARGED TOILET RMS. | 11/18/98 | 1,2,3 | 7/16/99 |
| A-302 | ENLARGED TOILET RMS. | 11/18/98 | 1,2,3 | 7/16/99 |
| A-303 | STAIR PLAN | 11/18/98 | 1,2 | 7/16/99 |
| A-304 | STAIR PLAN | 11/18/98 | 1,2 | 7/16/99 |
| A-305 | PUBLIC ENTRANCE DETAILS | 11/18/98 | 1,2,3 | 7/16/99 |
| A-305.1 | PUBLIC ENTRANCE DETAILS | 11/18/98 | 1,2,3 | 7/16/99 |
| A-305.2 | PUBLIC ENTRANCE DETAILS | 11/18/98 | | |
| A-305.3 | PUBLIC ENTRANCE DETAILS | 11/18/98 | | |
| A-306 | ELEVATOR PLAN | 11/18/98 | 1,2,3 | 7/16/99 |
| A-400 | PLAN DETAILS | 11/18/98 | 1,2,3 | 7/16/99 |
| A-500 | ROOF PLAN | 11/18/98 | 1,2,3 | 7/16/99 |
| A-600 | WALL SECTIONS | 11/18/98 | 1,2 | 5/28/99 |
| A-601 | WALL SECTIONS | 11/18/98 | 1,2,3 | 7/16/99 |
| A-602 | WALL SECTIONS | 11/18/98 | 1,2,3,4 | 7/16/99 |
| A-603 | WALL SECTIONS | 11/18/98 | 1,2 | 5/28/99 |
| A-604 | WALL SECTIONS | 11/18/98 | 1,2 | 7/16/99 |
| A-700 | INTERIOR ELEVATIONS | 11/18/98 | 1,2,3 | 7/16/99 |
| A-800 | ROOM FINISH SCHEDULE | 11/18/98 | 1,2,3 | 7/16/99 |
| A-801 | DOOR/WINDOW SCHEDULE | 11/18/98 | 1,2,3,4,5 | 7/16/99 |
| A-802 | DOOR SECTIONS/DETAILS | 11/18/98 | 1,2 | 5/28/99 |
| A-900 | REFLECTED CEILING PLAN- 1ST FLOOR REMODEL | 11/18/98 | 1 | 2/5/99 |
| A-901 | REFLECTED CEILING PLAN- 2ND FLOOR REMODEL | 11/18/98 | 1 | 2/5/99 |
| A-902 | REFLECTED CEILING PLAN- 1ST FLOOR NEW | 11/18/98 | 1 | 2/5/99 |
| A-903 | REFLECTED CEILING PLAN- 2ND FLOOR NEW | 11/18/98 | 1 | 2/5/99 |
| | | | | |
| | **STRUCTURAL DRAWINGS** | | | |
| S1 | FOUNDATION PLAN; FOUND. DETAILS | 11/18/98 | 1,2,3 | 7/16/99 |
| S2 | MAIN ENTRY FOUNDATION, FRM PLAN | 11/18/98 | 2 | |
| S3 | WALL SECTIONS | 11/18/98 | 2 | |
| S4 | ELEVATOR SECTIONS | 11/18/98 | | |
| S5 | FRAMING SECTIONS/DETAILS | 11/18/98 | | |
| S6 | PUMPS BUILDING PLANS | 11/18/98 | | |
| S7 | SCED/NOTES/MISC. DETAILS | 11/18/98 | 1,2,3 | 7/16/99 |

*RnJ*

Bombardier . angar Expansion / Agreement #98009-18
Rider "B" - Page Fifteen of Fifteen
Date: 11/01/99

**Bombardier Hangar Expansion -   G98009-01**
**Ft. Lauderdale, FL**

DRAWING LIST   (Continued)

| | MECHANICAL DRAWINGS | | | |
|---|---|---|---|---|
| M1 | 1ST FLOOR MECH PLAN- REMODEL | 11/18/98 | 1,2,3,4 | 7/16/99 |
| M2 | 2ND FLOOR MECH PLAN- REMODEL | 11/18/98 | 1,2,3,4 | 7/16/99 |
| M3 | 1ST FLOOR MECH PLAN- NEW | 11/18/98 | 1,2,3,4 | 7/16/99 |
| M4 | 2ND FLOOR MECH PLAN- NEW | 11/18/98 | 1,2 | 7/16/99 |
| M5 | MECHANICAL DETAILS | 11/18/98 | 1,2 | 7/16/99 |
| M6 | MECHANICAL SCHEDULES | 11/18/98 | | |
| | | | | |
| | PLUMBING DRAWINGS | | | |
| P1 | 1ST FLOOR PLUMB PLAN- REMODEL | 11/18/98 | 1,2 | 2/5/99 |
| P2 | 2ND FLOOR PLUMB PLAN- REMOPDEL | 11/18/98 | 1,2 | 2/5/99 |
| P3 | 1ST FLOOR PLUMB PLAN- NEW | 11/18/98 | 1,2 | 2/5/99 |
| P4 | 2ND FLOOR PLUMB PLAN- NEW | 11/18/98 | 1,2 | 2/5/99 |
| P5 | ENLARGED PLUMB PLAND, SCHED,DET | 11/18/98 | -1,2 | 2/5/99 |
| P6 | ENLARGED FLOOR PLANS | 11/18/98 | 1,2 | 2/5/99 |
| P7 | ROOF PLAN AND DETAILS | 11/18/98 | 1,2 | 2/5/99 |
| P8 | RISER DIAGRAMS | 11/18/98 | 1,2 | 2/5/99 |
| | | | | |
| | ELECTRICAL DRAWINGS | | | |
| SE1 | STIE ELECTRICAL PLAN AND DETAILS | 11/18/98 | 2 | 2/5/99 |
| ED1 | FIRST FLOOR ELEC. DEMOLITION PLAN | 11/18/98 | 1 | 2/5/99 |
| ED2 | SECOND FLOOR ELEC. DEMOLITION PLAN | 11/18/98 | | |
| E1 | ONE LINE DIAGRAMS; SHED. AND DETAILS | 11/18/98 | 2 | 2/5/99 |
| E2 | ELECTRICAL SYMBOLS LIST & SCHEDULES | 11/18/98 | 1,2 | 2/5/99 |
| E3 | ELECTRICAL PANEL SCEDULES | 11/18/98 | 1,2 | 2/5/99 |
| E4 | FIRST FLOOR POWER PLAN- AREA "A" | 11/18/98 | 1,2 | 2/5/99 |
| E5 | SECOND FLOOR POWER PLAN- AREA "A" | 11/18/98 | 1,2 | 2/5/99 |
| E6 | FIRST FLOOR POWER PLAN- AREA "B" | 11/18/98 | 1,2 | 2/5/99 |
| E7 | SECOND FLOOR POWER PLAN- AREA "B" | 11/18/98 | 1,2 | 2/5/99 |
| E8 | FIRST FLOOR LIGHTING PLAN- AREA "A" | 11/18/98 | 1 | 2/5/99 |
| E9 | SECOND FLOOR LIGHTING PLAN- AREA "A" | 11/18/98 | 1,2 | 2/5/99 |
| E10 | FIRST FLOOR LIGHTING PLAN- AREA "B" | 11/18/98 | 1,2 | 2/5/99 |
| E11 | SECOND FLOOR LIGHTING PLAN- AREA "B" | 11/18/98 | 1 | 2/5/99 |
| E12 | ELECTRICAL DETAILS | 11/18/98 | 2 | 2/5/99 |
| E13 | LIGHTNING PROTECTION PLAN | 11/18/98 | | |
| E14 | LIGHTNING PROTECTION DETAILS | 11/18/98 | | |
| E15 | LIGHTNING PROTECTION SECTIONS | 11/18/98 | | |
| E16 | LIGHTNING PROTECTION SECTIONS | 11/18/98 | | |
| E17 | FIRST FLOOR COMM/FIRE ALAR A PANEL- AREA "A" | 12/7/98 | 1 | 2/5/99 |
| E18 | SECOND FLR. COMM/FIRE ALARM PANEL- AREA "A" | 12/7/98 | 1,2 | 2/5/99 |
| E19 | FIRST FLR. COMM/FIRE ALARM PANEL- AREA "B" | 12/7/98 | 1,2 | 2/5/99 |
| E20 | SECOND FLR. COMM/FIRE ALARM PANEL- AREA "B" | 12/7/98 | 1,2 | 2/5/99 |
| | | | | |
| | FIRE PROTECTION | | | |
| FP1 | FIRE PUMP- FIRE PUMP ROOM AND DETAILS | 11/18/98 | | |
| FP2 | FIRE RISER ROOM AND DETAILS | 11/18/98 | | |
| FP3 | OVERHEAD AND COLUMN SYTEM- NEW HANGER | 11/18/98 | | |
| FP4 | OVERHEAD AND COLUMN SYTEM- EXIST. HANGER | 11/18/98 | | |
| FP5 | FIRST FLOOR OFFICES AND SHOPS- NEW- SOUTH | 11/18/98 | | |
| FP6 | FIRST FLOOR OFFICES AND SHOPS- NEW- NORTH | 11/18/98 | | |
| FP7 | SECOND FLOOR OFFICES AND SHOPS- NEW- SOUTH | 11/18/98 | | |
| FP8 | SECOND FLOOR OFFICES AND SHOPS- NEW- NORTH | 11/18/98 | | |
| FP9 | SECOND FLOOR OFFICES AND SHOPS- EXISTING | 11/18/98 | | |
| FP10 | FIRST FLOOR OFFICES AND SHOPS- EXISTING | 11/18/98 | | |

END OF RIDER "B"

## SECTION 16721

## FIRE ALARM SYSTEM

## PART 1 - GENERAL

### 1.01      DESCRIPTION

A.    EXTENT:  Provide equipment, wiring, conduit, standard
and special wall boxes and cabinets to make a complete
and functioning system as hereinafter specified and
shown on the plans. Provide equipment and materials
compatible to the system supplied. Equipment shall be
located as shown on the drawings. Equipment not
specifically specified or shown on the drawings, but
required for the operation of a completely functional
system shall be provided.

B.    Related Sections: The following Sections may contain
requirements that relate to this Section:

1.    Division 15 Section "Fire Protection" for water-
flow, pressure, tamper switches and/or fire pump
connected to fire alarm system.
2.    Division 15 Section "Pneumatic Control Systems"
for duct smoke detectors.
3.    Division 15 Section "Electric Control Systems" for
duct smoke detectors.
4.    Division 16 Section "Intrusion Detection Systems"
for Security monitoring.

### 1.02      CODES AND PERMITS:

A.    ALL WORK specified under this division of the
specifications shall be in accordance with the
following codes and agencies:

NFPA - 70 National Electric Code (Current Edition)
NFPA - 72 Fire (Current Edition)
NFPA - 101 Life Safety (Current Edition)
U.L. - 268 Smoke Detectors
U.L. - 1076 Security
Uniform Building Code - (Current Edition)
NEMA
NFPA - 90A (Current Edition)
FM -    Factory Mutual (Current Edition)

16721-1



PLAINTIFF'S
EXHIBIT
C

LK-98310

manufacturer shall send factory trained personnel to perform all necessary final electrical tests and adjustments at the jobsite and who shall then submit a "Letter of Certification" stating that: The system was tested and functions properly and that the system conforms to the requirements of these specifications. Tests to be performed and reports to be submitted shall be a specified hereinafter. The system manufacturer shall notify the Owners' Representative at least one week prior to final testing. All test reports shall be certified and sent to the Owners' Representative for review. Tests shall be performed in the presence of the Owners' Representative.

F.   ALL EQUIPMENT furnished under this specification shall be installed under the direct supervision of technically qualified full-time employees of the manufacturer of the specific equipment.

G.   APPROVED MANUFACTURERS:

Simplex Time Recorder

H.   THE FACT THAT a manufacturer is an APPROVED MANUFACTURER does not diminish their responsibility to meet all the criteria as directed in this specification.

I.   FOR THE basis of establishing a criteria for the required equipment, the specifications refer to Simplex equipment and model numbers.

J.   SUBSTITUTIONS of products proposed to be equal to those specified herein will be considered only when the following requirements have been met:
   1.   A COMPLETE LIST of such substituted products, with drawings and data sheets, shall be submitted to and approved by the consulting engineer, not less than ten (10) calendar days prior to scheduled date of opening of bids.
   2.   IT SHALL CONFORM to the standards herein and the manufacturer must supply proof of having produced similar equipment for at least ten years with a written history of system now rendering satisfactory service provided. Supplier of this equipment must also have had service and sales of the same equipment for the past four (4) years. Substitute equipment and its capabilities must be a standard part of that systems current product

supervision, individual notification appliance circuit supervision, incoming and standby power supervision. Include a control unit, signal circuit expander (if required), manual pull stations (fire alarm boxes), automatic fire detectors, horns, strobes, remote control devices, all wiring, connections to devices, outlet boxes, junction boxes, and all other necessary material for a complete operating system.

B.  APPLICATION: 4010 system sized as required based on number of addressable devices required and number audio/visual circuits. The fire alarm control unit shall allow for loading or editing special instructions and operating sequences as required. The system is to be capable of on-site programming to accommodate facilitate expansion, building parameter changes, or changes as required by local codes. All software operations are to be stored in a non-volatile programming memory within the fire alarm control unit. Loss of primary and secondary power shall not erase the instructions stored in memory. The ability for selective input/output control functions based on ANDing, Oring, NOTing, timing and special coded operations is to also be incorporated in the resident software programming of the system.
The FACU shall utilize TrueWare File Comparison Software to copy/analyze/compare and provide a detailed report to the system programmer indicating in detail any system operations which should be tested after changes are made to a system configuration. This utility shall report the differences between the two created database files (before and after).

C.  EQUIPMENT: U.L. approved and installed in accordance with the requirements of the National Electric Code, Local Codes and these specifications with the stricter requirement governing in case of possible variance. Systems equipment shall be jointly guaranteed by the Contractor and the Systems' Manufacturer for a period of one year from date of acceptance.


**HANGAR AUTOMATIC RELEASE FIRE ALARM CONTROL PANELS**


A.  EQUIPMENT: 4100 System by Simplex Time Recorder Co., unless otherwise indicated; shall be the standard product of one manufacturer and shall be factory coordinated. **This system shall comply with Simplex**

control all addressable devices and each initiating
device shall be individually addressable within the
building as follows. All wiring shall be Class A as
follows:

1.   Style 6 - Signaling Line Circuits (Addressable
     Circuits)
2.   Style D - Initiating Device Circuits
          (Wiring between Monitor IAMs and/or Relay
          IAMs & the device being monitored)
3.   Style Z - Notification Appliance Circuits
     (Horn/Strobe Circuits)

B.   The FACU shall be 24VDC operation with 120 VAC
     operating power. Twenty Four hours of standby power
     shall be provided by internally mounted properly sized,
     sealed gelyte lead acid batteries.
C.   ALARM INITIATION:  Provided from Manual Stations,
     Sprinkler Waterflow Switches located per plans and
     System Smoke Detectors and Heat Detectors as indicated.
     Provide Audio/Visual Alarm Indicating Devices on the
     interior of the building. Devices shall be located as
     shown on the drawings.

     GENERAL ALARM INDICATION:  Provide a general alarm when
     any initiating device described is activated. A system
     general alarm shall include:
     1.   Indicating the general alarm condition at the FACU
          and the annunciators.
     2.   Identifying the device that is the source of the
          alarm at the FACU and the annunciators.
     3.   Displaying the alarm on an 80 character LCD
          display. The system alarm LED shall flash on the
          control unit and the annunciator until the alarm
          has been acknowledged. Once acknowledged, this
          same LED shall latch on. A subsequent alarm
          received from another zone shall flash the system
          alarm LED on the control unit and  annunciator.
          The display shall show the new alarm information.
     4.   A pulsing alarm tone shall occur within the
          control unit and the annunciator until the event
          has been acknowledged.
     5.   Operating audible and visible alarm notification
          signals throughout the building.
     6.   Sounding a continuous fire alarm signal until
          silenced by the alarm silence switch at the
          control unit or at the annunciators.
     7.   All visible alarm notification appliances shall
          flash continuously until the Alarm Silence Switch

operation is complete, with a system trouble bell being mounted directly adjacent to the FACU.

G.   CITY CONNECTION:  Provide the connection from the Main FACU to an off-site Central Monitoring Facility via telephone line connection in order to provide automatic summons of the Fire Department in case of alarm. **THIS CONNECTION SHALL BE SHALL BE PREAPPROVED BY THE LOCAL AHJ.** (Telephone lines as required to be provided by Owner). System Supplier shall provide the equipment for this function. Electrical Contractor shall install and wire equipment per the suppliers and city's instruction.

H.   ALARM VERIFICATION: The activation of any system smoke detector shall initiate an Alarm Verification operation whereby the unit will reset the activated detector and wait for a second alarm activation.  If, within one (1) minute after resetting, a second alarm is reported to the FACU it shall process the alarm as described previously.  If no second alarm occurs within one minute the system is to resume normal operation.  The Alarm Verification is to operate only on smoke detector alarms.  Other activated initiating devices shall be processed immediately.  The alarm verification operation is to be selectable by device.
     1.   The control unit shall have the capability to display the number of times (tally) a zone or device has gone into a verification mode. Should this smoke verification tally reach a pre-programmed number, a trouble condition shall occur.
     2.   Alarm verification devices shall have the capability of being divided into eight different groups whereby only two verification zones from a group will confirm the first activation and cause the unit to follow programmed alarm sequence.

I.   SPRINKLER SUPERVISORY SIGNAL: The control unit is to have a dedicated supervisory service LED and a dedicated supervisory service acknowledge switch.
     1.   The activation of any standpipe or sprinkler valve tamper switch shall activate the system supervisory service audible signal and illuminate the LED at the control unit.  Differentiation between valve tamper activation and opens and/or grounds on fire alarm initiation circuit wiring shall be provided.
     2.   Activating the Supervisory Service Acknowledge

condition.

   c.  A record of the event in the FACU historical LOG.

   d.  Transmission of supervisory signal to remote central station.

   e.  Restoring the air pressure to normal shall cause the Supervisory Service LED to extinguish, indicating restoration to normal.

J.  MANUAL EVACUATION: Within the Control Unit a manual evacuation switch shall be provided to operate the systems alarm notification appliances.  Other control circuits shall not be activated.  However, a true alarm shall be processed as described previously.

K.  ACTIVATION of an auxiliary bypass switch shall override the automatic functions either selectively or throughout the system.

L.  ALARM AND TROUBLE CONDITIONS: Shall be immediately displayed on the control unit front alphanumeric display.  If more alarms or troubles are in the system, the operator may scroll to display new alarms.

     THE SYSTEM: Shall have an alarm list key that will allow the operator to display all alarms, troubles, and supervisory service conditions with the time of occurrence.  This shall allow for the determination of not only the most recent alarm but also may indicate the path that the fire is taking.

N.  ALL DOORS normally held open by door control devices shall release upon AC power failure. All magnetic door holders whether furnished by the system supplier or the door hardware supplier shall be 24vdc and shall be powered by the FACU. LCN door holder/closers for shall be furnished by the hardware supplier and wired by the electrical contractor. Door lock system on doors, with card readers shall be connected to the FACU for the purpose of releasing doors upon a fire alarm, if required due to type of lock and/or local AHJ. The fire alarm system supplier shall provide one form "c" dry contact for this purpose.

O.  THE CONTROL UNIT shall be capable of supplying up to 8 Amps @ 24VDC power output for external system use.

P.  Temperature supervision shall be provided as indicated on plans and per requirements of the RCE group.

supervised so that any power failure must be audibly and visibly indicated at the control unit and the annunciator. A green "power on" LED shall be displayed continuously while incoming power is present.

5. The system batteries shall be supervised so that a low battery condition or disconnection of the battery shall be audibly and visibly indicated at the control unit and the annunciator.

6. If a "LOW BATTERY" condition is left unattended a second stage "DEPLETED BATTERY" trouble condition shall be audibly and visibly reported at the control unit indicating the batteries are below the listed system operating voltage. Systems that completely shut down and fail to indicate a "DEPLETED BATTERY" condition shall be unacceptable.

## OPERATION

### HANGAR AUTOMATIC RELEASE FIRE ALARM CONTROL PANELS

A. FIRE ALARM CONTROL UNIT (FACU): Shall monitor and control all devices and initiating device shall be wired as follows:

1. Style D - Initiating Device Circuits
2. Style Y - Notification Appliance Circuits (Solenoid Control Circuit)

B. The FACU shall be 24VDC operation with 120 VAC operating power. <u>Twenty Four hours</u> of standby power shall be provided by internally mounted properly sized, sealed gelyte lead acid batteries.

C. ALARM INITIATION: Provided from Heat Detectors, located per plans and Manual Stations as indicated and shown on the drawings. Manual Stations to be Spectrum model SG-32SK2, blue in color, with "AFFF deluge" signage label. Manual stations are located in tank room and respective hanger, 2 per deluge zone. Heat detectors to be Simplex model # 4098-9410. Cross-zone as indicated per plans. Manual station to initiate immediate deluge activation of respective zone and additionally initiate column protection and provide indication to Building Fire Alarm Panel (4010) of initiation of deluge zone. Heat detectors will initiate deluge activation upon both zones going into alarm condition within respective

not only the most recent alarm but also may indicate the path that the fire is taking.

O. THE CONTROL UNIT shall be capable of supplying up to 8 Amps @ 24VDC power output for external system use.

P. SUPERVISION: Each independently supervised circuit shall include a discrete readout to indicate disarrangement conditions per circuit. The System Modules shall be electrically supervised for module placement. Should a module become disconnected the system trouble indicator shall illuminate and the audible trouble signal shall sound. The system shall have provisions for disabling and enabling all circuits individually for maintenance or testing purposes.

Q. POWER REQUIREMENTS:
1. The control unit shall receive 120 VAC power via a dedicated fused disconnect circuit.
2. The system shall be provided with sufficient battery capacity to operate the entire system upon loss of normal 120 VAC power in a normal supervisory mode for a period of [24] hours with [5] minutes of alarm operation at the end of this period. The system shall automatically transfer to battery standby upon power failure. All battery charging and recharging operations shall be automatic.
3. All circuits requiring system operating power shall be 24 VDC and shall be individually fused or equivalently protected at the control unit.
4. The incoming power to the system shall be supervised so that any power failure must be audibly and visibly indicated at the control unit and the annunciator. A green "power on" LED shall be displayed continuously while incoming power is present.
5. The system batteries shall be supervised so that a low battery condition or disconnection of the battery shall be audibly and visibly indicated at the control unit and the annunciator.
6. If a "LOW BATTERY" condition is left unattended a second stage "DEPLETED BATTERY" trouble condition shall be audibly and visibly reported at the control unit indicating the batteries are below the listed system operating voltage. Systems that completely shut down and fail to indicate a "DEPLETED BATTERY" condition shall be unacceptable.

Include interpretation and appropriate response for displays and signals, and briefly describe the functional operation of the system under normal, alarm, and trouble conditions.

B.   FIRE ALARM CONTROL UNIT (FACU)
1.   Control Unit construction shall be modular with solid state, microprocessor based electronics. It shall display only those primary controls and displays essential to operation during a fire alarm condition. Keyboards or keypads shall not be required to operate the system during fire alarm conditions. A local audible device shall sound during Alarm, Trouble or Supervisory conditions. This audible device shall also sound during each keypress to provide an audible feedback to ensure that the key has been pressed properly.
2.   The following control unit hardware shall be provided;
   a.   1 base panel with beige cabinet and door, 120VAC input power.
   b.   250 Addressable point capacity
   c.   Addressable Annunciator Circuit
   d.   4 Notification Appliance Circuits - Class A
   e.   2 Auxiliary Control Relays
   f.   Sufficient power to operate the control unit and minimum of 4 amps power for Notification Appliances (but sufficient enough for the entire system).
   g.   Battery Voltage and Amp Meters
   h.   1 Municipal City Circuit
   i.   1 RS-232 Port and 1 Modem Port
   j.   Common Event DACT or Point Reporting DACT (as required by AHJ)
3.   The following primary controls shall be visible through a front access Unit:
   a.   Individual red fire alarm LED
   b.   Individual yellow supervisory service LED
   c.   Eighty character liquid crystal display
   d.   Individual yellow trouble LED
   e.   Green "power on" LED
   f.   Yellow signals silenced LED
   g.   Fire alarm acknowledge key
   h.   Supervisory service acknowledge key
   i.   Trouble acknowledge key
   j.   Alarm silence key
   k.   System reset key
   l.   3 Status indicators for [Waterflow] [Sprinkler Supervisory] [Ground Fault]

accomplished in a self-directing manner in which prompting messages shall direct the user. These controls shall be located behind an access door.

    a.    Primary Keys, LED's and LCD Display

8.    The Control Unit shall have a 80 character liquid crystal display which shall be backlit for enhanced readability. So as to conserve battery standby power, it shall not be lit during an AC power failure unless an alarm condition occurs or there is keypad activity.

9.    Under normal conditions the front unit shall display a "System is Normal" message and the current time and date. System shall be Year 2000 Compliant.

10.    Should an abnormal condition be detected the appropriate LED (Alarm, Supervisory or Trouble) shall flash. The unit audible signal shall pulse for alarm conditions and sound steady for trouble and supervisory conditions.

11.    The LCD shall display the following information relative to the abnormal condition of a point in the system:

    a.    40 character custom location label

    b.    Type of device (i.e. smoke, pull station, waterflow)

    c.    Point status (i.e. alarm, trouble)

12.    Acknowledge functions may be passcode protected if the user has insufficient privilege to acknowledge such conditions. A message shall indicate insufficient privilege but allow the user to view the points without acknowledging them. Should the user have sufficient privilege to acknowledge, a message will be displayed informing the user that the condition has been acknowledged.

13.    After all points have been acknowledged, the LEDs shall glow steady and the tone alert will be silenced. The total number of alarms, supervisory and trouble conditions shall be displayed along with a prompt to review each list chronologically. The end of the list shall be indicated by an end of list message "END of LIST".

14.    Alarm Silencing:

    a.    Should the "Alarm Silence" button be pressed all alarm signals shall cease operation and a signals silenced LED will illuminate.

    b.    Signals shall not be silenced during alarm silence inhibit mode.

15.    System Reset:

    a.    The SYSTEM RESET button shall be used to

17. The system shall be capable of logging and storing events in separate alarm, supervisory, and trouble history logs. Each recorded event shall include the time and date of that event's occurrence. In addition, all events shall be capable of being displayed in a single combined log.

    a. The following Historical Alarm log events shall be stored:
        (1) Alarms
        (2) Alarm acknowledgment
        (3) Alarm Silence
        (4) System reset
        (5) Alarm historical log cleared

    b. The following Historical Supervisory log events shall be stored:
        (1) Supervisory alarms
        (2) Supervisory acknowledgment

    c. The following Historical Trouble log events shall be stored:
        (1) Trouble conditions
        (2) Supervisory alarms
        (3) Trouble acknowledgment
        (4) Supervisory acknowledgment
        (5) Alarm verification tallies
        (6) One Person test results
        (7) Trouble historical log cleared

18. Silent One Person Testing with History Logging

    a. The system shall be capable of being tested by one person. While in testing mode the alarm activation of an initiating device circuit shall be silently logged as an alarm condition in the historical data file. The unit shall automatically reset itself after logging of the alarm.

    b. The momentary disconnection of an initiating or indicating device circuit shall be silently logged as a trouble condition in the historical data file. The unit shall automatically reset itself after logging of the trouble condition.

    c. Should the one person test feature be on for an inappropriate amount of time it shall revert to the normal mode automatically. After testing is considered completed, testing data may be retrieved from the system in chronological order to ensure device/circuit activation.

19. LED Supervision. All control module LEDs shall be supervised for burnout or disarrangement. Should a

       (5)   On/off/auto control
       (6)   Disable/enable
       (7)   Clear historical alarm log
       (8)   Clear historical trouble log
       (9)   One person testing
       (10)  Change alarm verification

g.   Acknowledge keys shall also require privileged access to acknowledge points. If the operator presses an (ACK) key with insufficient access, an error message will be displayed. The points will scroll with (ACK) key presses to view the points on the list, but the points will not get acknowledged in the database.

h.   Fire Alarm Control Unit shall be capable of operating a remote maintenance terminal and/or printers; output shall be ASCII from an EIA RS-232-C connection with an adjustable baud rate.

i.   Each RS-232-C port shall be capable of supporting and supervising a remote Printer or a remote maintenance terminal. Each port shall be field configurable for supervised operation (to be used when the remote maintenance terminal or printer is permanently installed as part of the system) or for unsupervised operation (for use with portable remote devices that are temporarily connected for testing reports or diagnostic analysis).

22.   SMOKE SENSOR SENSITIVITY ADJUSTMENT:

a.   SMOKE SENSORS SHALL be smoke density measuring devices having no self contained alarm set point (fixed threshold). The alarm decision for each sensor shall be determined by the control unit. The control unit shall determine the condition of each sensor by comparing the sensor value to the stored values.

b.   AUTHORIZED OPERATION of controls at the FACU shall cause the selection of specific addressable smoke sensors for adjustment, display of their current status and sensitivity settings, and control of changes in those settings.

c.   REMOTE CONTROLLABILITY: Individually monitor sensors at the FACU for calibration, sensitivity, and alarm condition, and individually adjust for sensitivity from the

16721-23          LK-98310

settings of each sensor based on time-of-day and day-of-week (for example, to be more sensitive during unoccupied times and less sensitive during occupied periods). There shall be a minimum of <u>seven (7)</u> sensitivity settings available for each sensor.

h.   THE CONTROL UNIT shall have the capability of being programmed for a pre-alarm or two-stage function. This function allows an indication to occur when, for example, a 3% sensor reaches a threshold of 1.5% smoke obscuration.

i.   THE CONTROL UNIT shall automatically indicate when an individual sensor needs cleaning.

j.   WHEN A SENSORS average value reaches a predetermined value, a "DIRTY SENSOR" trouble condition shall be audibly and visually indicated at the control unit for the individual sensor. Additionally, the LED on the sensor base shall glow steady giving a visible indication at the sensor location.

k.   IF A "DIRTY SENSOR" is left unattended, and its average value increases to a second predetermined value, an "EXCESSIVELY DIRTY SENSOR" trouble condition shall be indicated at the control unit for the individual sensor.

l.   TO PREVENT FALSE alarms, these "DIRTY" conditions shall in no way decrease the amount of smoke obscuration necessary for system activation.

m.   THE CONTROL UNIT shall continuously perform an automatic self-test routine on each sensor which will functionally check sensor electronics and ensure the accuracy of the values being transmitted to the control unit. Any sensor that fails this test shall indicate a "SELF TEST ABNORMAL" trouble condition.

n.   THE FACU SHALL be listed for automatic compliance with NFPA 72 Sensitivity Testing requirement.

o.   IF THE PROPOSED system does not have the capabilities defined in [22.] a maintenance and testing service providing the following shall be included with the base bid:

(1)   Bi-annual sensitivity reading and logging for each smoke sensor. This is to be accomplished by use of a UL listed

16721-25                    LK-98310

(battery) power conditions. Systems which cannot support 100% of their points in alarm simultaneously cannot assure appropriate system response and are not acceptable.

c.  All addressable devices are to have the capability of being disabled or enabled individually.

d.  Up to 250 addressable devices may be multi-dropped from a single pair of wires. Systems that require factory reprogramming to add or delete devices are unacceptable. Systems which require a special tool and/or programming unit shall provide the special tool and/or programming unit to the owner upon project completion and provide a minimum of (8) hours training to the owners representative.

e.  Format -
The communication format must be a poll/response protocol to allow t-tapping of the wire to addressable devices and be completely digital.  A high degree of communication reliability must be obtained by using parity data bit  error  checking routines  for address codes and check sum routines for the data transmission protocol.  Systems that do not  utilize  full digital transmission protocol (i.e. - that may use time pulse width  methods  to  transmit data, etc..) will not be acceptable  since they  are considered  unreliable and prone to errors.

f.  Identification of Addressable Devices -
Each addressable device must be uniquely identified by an address code entered on each device at time of installation.  The use of jumpers to set address will not be acceptable due to the potential of vibration and poor contact.

g.  Wiring Type, Distance, Survivability and Configuration - Wiring types will be approved by the equipment manufacturer. The system must allow up to 2,500 feet wire length to the furthest addressable device. T-tapping of the communications channel will be supported except where Class A wiring is required.

C.  FIRE ALARM CONTROL UNIT
Where shown on the plans, provide and install a Simplex Type 4010 Fire Alarm Control Unit for

A.   ADDRESSABLE MANUAL FIRE ALARM STATIONS: Manual fire
     alarm stations, Type 4099-9003 double action, plainly
     marked to "Push and Pull Lever" to sound alarm, located
     as shown on the plans at a height of 48" from finished
     floor; circuit shall be 4-wire addressable loop
     supervision. Provide 2975-9178 backbox for surface
     mount or mount on a 4" square box with single gang trim
     ring for semiflush mount. When Manual Stations are to
     be mounted on the exterior of the building, provide
     each unit with (1) 2099-9817 Weatherproof, Clear, "Lift
     to Activate" Cover and (1) 2099-9818 Surface
     Weatherproof Adapter Kit.

B.   True Alarm Quick Connect Sensors shall be 4098-9710 and
     shall not require a base. True Alarm Standard Sensors
     and Addressable Sensor Bases shall be Simplex Type
     4098-9714 Sensor with a 4098-9792 Base. For locations
     requiring a relay base it shall be a 4098-9791 Base
     with a supervised relay driver output and a 2098-9737.
     For locations requiring a sounder in the base it shall
     be a 4098-9791 Base with a supervised relay driver
     output and a 2098-9737. The addressable smoke sensors
     shall be of the photoelectric type and shall
     communicate actual smoke chamber values to the system
     control unit. The sensors shall be listed to UL
     Standard 268 and shall be documented as compatible with
     the control equipment to which they are connected. The
     sensors shall be listed for both ceiling and wall mount
     applications. Each sensor and/or base shall contain a
     LED that will flash each time it is scanned by the
     control unit (once every 4 seconds). When the control
     unit determines that a sensor is in the alarm or a
     trouble condition, the control unit shall command the
     LED on that sensor's base to turn on steady indicating
     the abnormal condition. Sensors which do not provide a
     visible indication of an abnormal condition at the
     sensor location shall not be acceptable. Each sensor
     shall contain a magnetically actuated test switch to
     provide for easy alarm testing at the sensor location.
     Each sensor shall be scanned by the control panel for
     its type identification to prevent inadvertent
     substitution of another sensor type.  The control unit
     shall operate with the installed device but shall
     initiate a "Wrong Device" trouble condition until the
     proper type is installed or the programmed sensor type
     is changed. The sensor's electronics shall be immune
     from false alarms caused by EMI and RFI. All Sensor
     Bases shall mount on a 4" Octagon 2 1/8" deep box.
     Relay Bases shall require a 4" Octagon 2 1/8" deep box

16721-29                         LK-98310

1.   An addressable interface module shall be provided for interfacing normally open direct contact devices to an addressable signaling line circuit. The device shall be a Simplex Type Individual Addressable Module (IAM).

2.   IAM's shall be capable of mounting in a standard 4 11/16" square, 2 1/8" deep electric box with a 4 11/16" square 1 1/2" deep extension ring.  IAM's shall include cover plates to allow surface or flush mounting.  IAM's shall receive their 24VDC power from a separate two wire pair running from an appropriate power supply.

3.   There shall be two types of devices:
     Type 1: Control IAM relay
     Type 2: IAM (Individually Addressable Module)

4.   For Type 2
     a.   For contact device monitoring with Style D (NFPA-72 initiating device circuit) wiring supervision.
     b.   Type 2 only: This type of addressable device module shall monitor the status of a zone consisting of conventional N/O contact devices as specified elsewhere and identified on the plans.  The supervision of the initiating device circuit wiring shall be Style D.  These IAM's shall communicate the zone's status (normal, alarm, trouble) to the control unit. This device cannot power 2-wire smoke detectors.

5.   For Type 1 above:
     a.   For non-supervised control.
          This type of addressable device shall provide double pole, double throw relay switching for loads up to 120VAC.  It shall contain easily replaceable 2 amp fuse, one on each common leg of the relay.

6.   The IAM shall be supervised and uniquely identified by the control unit.  Device identification shall be transmitted to the control unit for processing according to the program instructions.  Should the IAM become non-operational, tampered with, or removed, a discrete trouble signal, unique to the device, shall be transmitted to, and annunciated at, the control unit.

7.   The IAM shall be capable of being programmed for its "address" location on the addressable device signaling circuit. The IAM shall be compatible with addressable manual stations and addressable

I.    INTERIOR VISUAL ONLY fire alarm signal device shall be
      Model 4904-9137 Red Vertical Wall Mount w/ UL 1971/ADA
      Strobe unit, 24VDC, 0.100 amp with diodes for
      electrical supervision of wiring and 24VDC, **15 candela**,
      xenon flasher, mounted on a 1-gang flush mounted box.
      Selected locations as shown on the plans shall utilize
      Model 4904-9136 UL 1971/ADA Strobe unit, 24VDC, 0.200
      amp with diodes for electrical supervision of wiring
      and 24VDC, **110 candela**, xenon flasher, mounted on a 1-
      gang flush mounted box. Surface mounted units shall use
      a single gang Wiremold box #5744S or equal. Exterior
      areas shall use a 4905-9907 High Humidity Gasket Kit
      and a 4905-9910 Surface Adapter Plate mounted on a
      weatherproof box (RACO #5324 single gang or equal).

J.    INTERIOR SYNCHRONIZED STROBE AUDIO/VISUAL fire alarm
      signal device shall be Model 4903-9422 Red Horizontal
      Wall Mount w/ UL 1971/ADA Strobe unit and horn, 24VDC,
      0.138 amp with diodes for electrical supervision of
      wiring and 24VDC, **15 candela**, xenon flasher, mounted on
      a 4" square flush mounted box. Selected locations as
      shown on the plans shall utilize Model 4903-9424 UL
      1971/ADA Strobe unit and horn, 24VDC, 0.238 amp with
      diodes for electrical supervision of wiring and 24VDC,
      **110 candela**, xenon flasher, mounted on a 4" square
      flush mounted box. Surface mounted units shall use a
      2975-9145 back box with a 4905-9903 adapter plate.

K.    INTERIOR SYNCHRONIZED VISUAL ONLY fire alarm signal
      device shall be Model 4904-9305 Red Vertical Wall Mount
      w/ UL 1971/ADA Strobe unit, 24VDC, 0.100 amp with
      diodes for electrical supervision of wiring and 24VDC,
      **15 candela**, xenon flasher, mounted on a 1-gang flush
      mounted box. Selected locations as shown on the plans
      shall utilize Model 4904-9309 UL 1971/ADA Strobe unit,
      24VDC, 0.200 amp with diodes for electrical supervision
      of wiring and 24VDC, **110 candela**, xenon flasher,
      mounted on a 1-gang flush mounted box. Surface mounted
      units shall use a single gang Wiremold box #5744S or
      equal. Exterior areas shall use a 4905-9907 High
      Humidity Gasket Kit and a 4905-9910 Surface Adapter
      Plate mounted on a weatherproof box (RACO #5324 single
      gang or equal).

L.    STROBES REQUIRING SYNCHRONIZATION shall be connected to
      an Indicating Appliance Circuit (horn circuit) which
      has a 4905-9914 Synchronized Flash Module inserted on
      it. Synchronized Flash Module shall be installed in a

16721-33                    LK-98310

Annunciator, Simplex Type 4606-9101, with a two line by 40 character (80 character total) LCD display. Annunciator shall Display all Alpha/Numeric messages as displayed at the FACU, Annunciator shall also contain an alarm, trouble and supervisory service LED and acknowledgment switches, system reset and alarm silence switch, display time key, (3) programmable indicating LED's, alarmed silence LED and a key switch to activate or deactivate all other switches. Annunciator shall mount on a six gang box and be connected to the FACU with one BSCC #S1802SLC10 (.210" OD) twisted shielded pair of 18's and two #14 power wires. Capabilities shall exist for a maximum of (6) 4606-9101's per 4010 FACU.

## PART 3 - EXECUTION
### 3.01      FIRE ALARM INSTALLATION AND WIRING

A.   FURNISH AND INSTALL wiring, conduit, junction boxes and outlet boxes required for the installation of a complete system. <u>Wiring shall be installed in power limited, U.L. Listed Fire Alarm Cable</u>, with metallic <u>shield or conduit.</u> All wiring shall be #14 gauge solid copper, with the exception of the IDNET addressable cable which shall be equal to BSCC #S1802SLC10 (.210" OD) and ADA Audio/Visual signals shall be wired with BSCC #S1402S10 (.211" OD). Shall be color coded throughout and shall test free and clear of opens, grounds and shorts between conductors. Equipment shall be grounded with an approved earth ground wire being supplied at the control unit. Wiring shall be in conformance with Article 760 of the National Electric Code. Verify all wiring with system manufacturer prior to installation.

B.   DEVICE INSTALLATION
     1.   Smoke Detectors: Install ceiling-mounted detectors not less than 4 inches from a sidewall to the near edge. Install detectors located on the wall at least 4 inches but not more than 12 inches below the ceiling. For exposed solid joist construction, mount detectors on the bottoms of the joists. On smooth ceilings, install detectors not over 30 feet apart in any direction. Install detectors no closer than 5 feet from air registers.
     2.   Audible Notification Appliances: Install not less than 80 inches above the finished floor nor less than 6 inches below the ceiling. Install bells and

4.   System Wiring: Wire and cable shall be a type listed for its intended use by an approval agency acceptable to the Authority Having Jurisdiction (AHJ) and shall be installed in accordance with the appropriate articles from the current approved edition of the National Electric Code (NEC)(NFPA 70). It is the Contractor's responsibility to obtain from the Fire Alarm System Manufacturer written instruction regarding the appropriate wire/cable to be used for this installation. No deviation from the written instruction shall be made by the Contractor without the prior written approval of the Fire Alarm System Manufacturer.

5.   Color Coding: Color-code fire alarm conductors differently from the normal building power wiring. Use one color code for alarm initiating device circuits wiring and a different color code for supervisory circuits. Color-code notification appliance circuits differently from alarm-initiating circuits. Paint fire alarm system junction boxes and covers red.     -

6.   Risers: Install at least 2 vertical cable risers to serve the fire alarm system. Separate risers in close proximity to each other with a minimum one-hour-rated wall, so the loss of one riser does not prevent the receipt or transmission of signal from other floors or zones.

7.   Wiring to Central Station Transmitter: 1-inch conduit between the FACU and the central station transmitter connection as indicated. Install number of conductors and electrical supervision for connecting wiring as required to suit central-station monitoring function.

F.   GROUNDING: Ground equipment and conductor and cable shields as specified by the equipment manufacturer. For audio circuits, minimize to the greatest extent possible ground loops, common mode returns, noise pickup, cross talk, and other impairments. Provide 5-ohm ground at main equipment location. Measure, record, and report ground resistance.

G.   FIELD QUALITY CONTROL:
1.   Manufacturer's Field Services: Provide services of a factory-authorized service representative to supervise the field assembly and connection of components and the pretesting, testing, and adjustment of the system.

2.   Pretesting: Upon completing installation of the

appliance for alarm operation and proper response at the control unit. Test smoke detectors with actual products of combustion.

h. Measure and record the actual current draw of each Notification Appliance Circuit.

i. Test the system for all specified functions according to the manufacturer's operating and maintenance manual. Systematically initiate specified functional performance items at each station including making all possible alarm and monitoring initiations and using all communications options. For each item, observe related performance at all devices required to be affected by the item under all system sequences. Observe indicating lights, displays, signal tones, and annunciator indications.

j. Test both primary power and secondary power. Verify, by test, the secondary power system is capable of operating the system for the period and in the manner specified.

k. Retesting: Correct deficiencies indicated by tests and completely retest work affected by such deficiencies. Verify by the system test that the total system meets the Specifications and complies with applicable standards.

l. Report of Tests and Inspections: Provide a written record of inspections, tests, and detailed test results in the form of a test log. Submit log upon the satisfactory completion of tests.

m. Tag all equipment, stations, and other components at which tests have been satisfactorily completed.

n. In order to obtain a certificate of occupancy. Demonstrate that the system meets the Specifications and complies with applicable standards. This final test shall be witnessed by a representative of the Authority Having Jurisdiction and a factory-authorized service representative.

H. CLEANING AND ADJUSTING

1. Cleaning: Remove paint splatters and other spots, dirt, and debris. Touch up scratches and mars of finish to match original finish. Clean unit internally using methods and materials recommended by manufacturer.

without additional expense to Owner, within a reasonable time after notice. System equipment shall be guaranteed by the manufacturer for two years.

## 3.04   MAINTENANCE SERVICE

A.   Maintenance Service Contract: Provide a maintenance contract to owner (for his purchase approval) at the start of the warranty period. **THIS CONTRACT SHALL NOT BE INCLUDED IN THE BID.** This contract shall cover the fire alarm systems and equipment for a period of 12 months commencing with Substantial Completion, using factory-authorized service representatives.

1. Basic Services: Systematic, routine maintenance visits on a [quarterly] basis at times coordinated with the Owner. In addition, respond to service calls within 24 hours of notification of system trouble. Adjust and replace defective parts and components with original manufacturer's replacement parts, components, and supplies.

2. Additional Services: Perform services within the above 12-month period not classified as routine maintenance or as warranty work as described in Division 1 Section "Warranties and Bonds" when authorized in writing. Compensation for additional services must be agreed upon in writing prior to performing services.

3. Renewal of Maintenance Service Contract: No later than 60 days prior to the expiration of the maintenance services contract, deliver to the Owner a proposal to provide contract maintenance and repair services for an additional one-year term. Owner will be under no obligation to accept maintenance service contract renewal proposal.

**END OF SECTION**

16721-41                          LK-98310

# ⊊ Simplex

3801 Commerce Parkway
Miramar, FL 33025 U.S.A.
Sales (954) 431-3700
Service (954) 431-3900
Fax (954) 435-6650

www.simplexnet.com

March 13, 2001

Fine Line Construction & Electric
210 Lock Road
Deerfield Beach, Fl 33442

REF:      **BOMBARDIER AVIATION HANGER "B" FIRE ALARM**
          SIMPLEX PROJECT #263-990191-02

Dear Sir:

Thank you for choosing Simplex as the provider of your new fire alarm system/equipment. As of this date. March 7, 2001, work/construction on this project is substantially complete and your system/equipment is operating according to our published specifications. Accordingly, Simplex provides a one (1) year warranty, which is now in effect and will expire on March 6, 2002.

Simplex certifies that all initiation devices, all annunciators and all indicating appliances have operated and functioned properly.

Simplex has completed and signed section 3 of the "Certificate of Completion" for this project in accordance with the National Fire Alarm Code.

Unless specifically negotiated or contracted otherwise, warranty service is available during regular working hours, i.e. 8AM-5PM, Monday through Friday, excluding holidays. The warranty coverage does not include preventative maintenance or equipment provided by others.

We want you to get the optimum performance from the equipment you have purchased from Simplex, but if a warranty problem reported cannot be substantiated by Simplex, we will invoice you for our services.

Please be advised that the performance and longevity of your new system/equipment is directly related to the amount of periodic care and maintenance to which it receives. Therefore, Simplex recommends that periodic preventative maintenance be performed to protect your investment. Failure to do necessary preventative maintenance can also put your warranty coverage at risk.

Simplex maintains its commitment to you by providing warranty and maintenance services. Our planned service agreements are tailored to you and your new system/equipment needs.

Should you need warranty service or wish to discuss your maintenance needs, please call our office at 954-431-3900. The following people are available to assist you:

| | |
|---|---|
| Dee Dee Rodriguez | Service Dispatch |
| Laurie Haddaway | Service Dispatch |
| Allison Genauer | Service Dispatch |
| James Drury | Branch Service Manager |
| Alfred Diaz | Service Sales Representative |
| Wilfredo Gomez | Service Sales Representative |

Simplex appreciates your business and wants to maintain a long-term business partnership with you, our customer. Please feel free to call me if you have any questions about the project. We look forward to serving you.

Sincerely,

Philip Bailey
Branch Operations Manager

Cc:      Service Sales
         Service Manager

*Wilma G. Beckman*
Print type or stamp name of Notary Public
Personally known ☒ OR Produced I.D. ☐
Type of I.D. produced:_____



OFFICIAL NOTARY SEAL
WILMA G BECKMAN
COMMISSION NUMBER
CC900785
MY COMMISSION EXPIRES
JAN. 29,2004

**PLAINTIFF'S EXHIBIT**
D

# Simplex

## SIMPLEX WARRANTY:

"WARRANT: SIMPLEX WARRANTS TO THE PURCHASER (1) OF NEW SIMPLEX PRODUCTS THAT DURING THE EFFECTIVE PERIOD OF THE WARRANTY SUCH PRODUCTS SHALL BE FREE OF DEFECTS IN WORKMANSHIP AND MATERIAL. SIMPLEX WARRANTS THAT THE PRODUCT (AS DISTINGUISHED FROM SOFTWARE) BE FREE FROM DEFECTS IN MATERIAL AND WORKMANSHIP UNDER NORMAL USE FOR A PERIOD OF ONE YEAR FROM THE DATE OF FIRST BENEFICIAL USE OF ALL OR ANY PART OF THE PRODUCT OR 18 MONTHS AFTER PRODUCT SHIPMENT WHICHEVER IS EARLIER.

SIMPLEX'S SOLE RESPONIBILITY UNDER THIS WARRANTY SHALL BE TO REPAIR, ADJUST OR REPLACE AT ITS OPTION ANY PRODUCT WHICH FAILS DURING THIS PERIOD PROVIDED PURCHASER HAS PROMPTLY REPORTED SUCH FAILURE TO SIMPLEX IN WRITING. ALL REPLACED PRODUCTS OR PARTS SHALL BECOME SIMPLEX'S PROPERTY. SERVICES PROVIDED UNDER THIS WARRANTY WILL BE PERFORMED DURING THE PERIOD OF 8:00 A.M. TO 5:00 P.M., LOCAL TIME: MONDAY THROUGH FRIDAY, EXCLUDING LOCALLY OBSERVED SIMPLEX HOLIDAYS. PURCHASER (1) AGREES TO PROVIDE FULL AND FREE ACCESS TO AUTHORIZED SIMPLEX EMPLOYEES.

THIS WARRANTY IS CONTINGENT ON THE PROPER INSTALLATION AND USE OF THE PRODUCTS. SUCH WARRANTY WILL NOT APPLY IF ADJUSTMENT, REPAIR OR PARTS REPLACEMENT IS REQUIRED BECAUSE OF ACCIDENT, UNUSUALLY PHYSICAL, ELECTRICAL OR ELECTROMECHANICAL STRESS, NEGLECT, MISUSE, USER PROGRAMMING ERRORS, FAILURE OF ELECTRICAL POWER, AIR CONDITIONING OR HUMIDITY CONTROL TRANSPORTATION OR CAUSE OTHER THAN ORDINARY USE. REPLACEMENT PARTS PROVIDED UNDER WARRANTY OF PRODUCTS MAY CONTAIN USED PARTS WHICH ARE EQUIVALENT TO NEW PARTS WHEN USED IN PRODUCTS.

THIS WARRANTY EXCLUDES:

- LABOR, TRAVEL, PARTS AND MILEAGE FOR SERVICES OUTSIDE OF SIMPLEX NORMAL BUSINESS HOURS.
- LABOR, TRAVEL, PARTS AND MILEAGE FOR PROGRAM AND/OR LABOR CHANGES.
- LABOR, TRAVEL, PARTS AND MILEAGE FOR FAILURES DUE TO EXTERNAL CAUSE.
- ELECTRICAL WORK EXTERNAL TOTHE EQUIPMENT SUPPLIED BY SIMPLEX OR MAINTENANCE OF ACCESSORIES, ALTERATIONS, ATTACHMENTS OR OTHER DEVICES NOT FURNISHED BY SIMPLEX.

SERVICES OUTSIDE OF THIS WARRANTY WILL BE FURNISHED AT SIMPLEX'S CURRENT TIME, MATERIAL AND TRAVEL CHARGES THEN IN EFFECT.

EXCEPT FOR THE EXPRESS WARRANTIES STATED HEREIN, SIMPLEX DISCLAIMS ALL WARRANTIES ON PRODUCTS FURNISHED HEREUNDER, INCLUDING WITHOUT LIMITATION, ALL IMPLIED WARRANTIES OR MERCHANTABILITY AND FITNESS; AND THE STATED WARRANTIES ARE IN LIEU OF ALL OBLIGATIONS OR LIABILITIES ON THE PART OF SIMPLEX ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OF THE PRODUCTS. IN NO EVENT WILL SIMPLEX BE HELD LIABLE FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES.

(1)     SIMPLEX AGREES TO CONTINUE TO HONOR ALL OF THE UNEXPIRED EXPRESS WARRANTIES SPECIFIED ABOVE ON DEFECTIVE EQUIPMENT AFTER TRANSFER OF THE EQUIPMENT TO PURCHASER'S CUSTOMER. PROVIDED PURCHASER'S CUSTOMER ASSUMES THE PURCHASER'S OBLIGATIONS SPECIFIED ABOVE.



Exhibit B

**American Arbitration Association**

# CONSTRUCTION INDUSTRY ARBITRATION RULES
## DEMAND FOR ARBITRATION

| | |
|---|---|
| *MEDIATION   If you want the AAA to contact the other party and attempt to arrange a mediation. please check this box.* | ☐ |

| TO: Name of Respondent | **See attached.** | Name of Representative (if known) | **See Attached** | | |
|---|---|---|---|---|---|
| Address | | Address | | | |
| City | State | Zip Code | City | State | Zip Code |
| Phone No. | Fax No. | | Phone No. | Fax No. | |

THE NAMED CLAIMANT. A PARTY TO A WRITTEN AGREEMENT PROVIDING FOR ARBITRATION UNDER THE CONSTRUCTION INDUSTRY ARBITRATION RULES. HEREBY DEMANDS ARBITRATION THEREUNDER.   (ATTACH THE ARBITRATION CLAUSE) **See Attached Contract**

NATURE OF DISPUTE (Please give enough details to enable the AAA to select arbitrators with appropriate experience)

**See attached.**

| DOLLAR AMOUNT OF CLAIM | OTHER RELIEF SOUGHT |
|---|---|
| **$3,000,000.00** | **None at this time.** |

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE

**Experience with large construction contracts with knowledge of architecture and engineering, particularly pertaining to fire detection and suppression systems.**

CLAIMANT IS
☒ Owner   ☐ Design Professional   (specify _____ )   ☐ Contractor
☐ Subcontractor   (specify _____ )   ☐ Other (specify _____ )

RESPONDENT IS
☐ Owner   ☐ Design Professional   (specify _____ )   ☒ Contractor
☒ Subcontractor   (specify _____ )   ☐ Other (specify _____ )

ESTIMATED TIME NEEDED FOR HEARINGS OVERALL _____ hours   **10**   _____ days

Copies of this demand are being filed with the American Arbitration Association at its   **Atlanta, Georgia**   office. Claimant requests that AAA commence the administration of the arbitration. Under the rules. you may file an answering statement within ten days after notice from the AAA.

CLAIMANT REQUESTS THAT ARBITRATION HEARINGS BE HELD AT THE FOLLOWING LOCALE

**Fort Lauderdale, Florida**

| Signature (may be signed by a representative) | Title   **Attorney** | Date   **9/4/02** |
|---|---|---|

| Name of Claimant   **Learjet, Inc.** | | | Name of Representative   **Lewis F. Collins, Jr.** | | |
|---|---|---|---|---|---|
| Address   PO Box 7707, Mailstop #1 | | | Address   6200 Courtney Campbell Causeway, Ste. 1100 | | |
| City   Wichita | State   KS | Zip Code   67277 | City   Tampa | State   FL | Zip Code   33607 |
| Phone No.   316/946-3037 | Fax No.   316/946-7833 | | Phone No.   813/281-1900 | Fax No.   813/281-0900 | |

TO INSTITUTE PROCEEDINGS. PLEASE SEND THREE COPIES OF THIS DEMAND AND THE ARBITRATION AGREEMENT. WITH THE FILING FEE. AS PROVIDED FOR IN THE RULES. TO THE AAA. SEND THE ORIGINAL DEMAND TO THE RESPONDENT.

## American Arbitration Association
## CONSTRUCTION INDUSTRY ARBITRATION RULES
## DEMAND FOR ARBITRATION

### Respondent No. 1

Name of Respondent:    Konover Construction Corporation South

Address:    16 Munson Road; P.O. Box 4052, Farmington, CT 06034-4052

Name of Counsel:    Joseph W. Downs, III

Address:    3300 Ponce De Leon Boulevard, Coral Gables, FL 33134

### Respondent No. 2

Name of Respondent:    Law/Kingdon, Inc.

Address:    345 Riverview; P.O. Box 1094, Wichita, KS 67201

Name of Registered Agent:    CT Corporation System

Address:    1200 S. Pine Island Road, Plantation, FL 33324

### Respondent No. 3

Name of Respondent:    Fine Line Construction & Electric, Inc.

Address:    210 Lock Road, Deerfield Beach, FL 33429

Name of Counsel:    Gary A. Isaacs, Esq.

Address:    One Clearlake Centre, Suite 1401, 250 Australian Avenue South, West Palm Beach, FL 33401

## Respondent No. 4

Name of Respondent:          Treasure Coast Fire Protection Systems, Inc.

Address:                     12414 Pleasant Green Way, Boynton Beach, FL 33437


Name of Registered Agent:    John W. Farabee, Jr.

Address:                     12414 Pleasant Green Way, Boynton Beach, FL 33437


## Respondent No. 5

Name of Respondent:          SimplexGrinnell LP

Address:                     100 Simplex Drive, Westminster, MA 01441


Name of Counsel:             James E. Zloch, Esq.

Address:                     SouthTrust Tower, 5th Floor, One East Broward Boulevard, Ft. Lauderdale, FL 33302

**American Arbitration Association**
**CONSTRUCTION INDUSTRY ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

**NATURE OF DISPUTE**

I.    **GENERAL AVERMENTS**


This dispute arises out of a contract dated July 13, 1998, between Learjet, Inc. (hereinafter "Learjet") and Konover Construction Corporation South (hereinafter "Konover") for the design and construction of an airplane hangar located in Fort Lauderdale, Broward County Florida.  (See the attached contract, hereinafter "Contract")[1].  Law/Kingdon, Inc. (hereinafter "Law/Kingdon"), was retained by and through Konover to serve as the Architectural and Engineering firm on the turn-key construction project.  The contract included the design and construction of an airplane hangar, attached offices and storage with approximate dimensions of 230' x 210', as well as renovations to the existing Learjet hangar located at this location.


The Contract was executed by the parties on July 23, 1998.  According to the Contract, initially Konover was to meet Substantial Completion of the new hangar no later than June 7, 1999, and Substantial Completion of the renovations to the existing hangar no later than August 13, 1999.  These dates were modified by the parties by amendments.

_____

[1] The entire contract at issue consists of several hundred pages, and the original terms and conditions agreed to by the parties are attached hereinafter as Exhibit "A"; the specifications, attachments, amendments, and change orders that are/may also be part of the contract are available for each party's review, and will be copied and provided as each party may desire.

The first amendment dated October 7, 1999 provided that Substantial Completion shall occur with regard to the new hangar no later than two hundred ten (210) days after issuance of the site and building permits, and Substantial Completion of the existing building renovation would be no later than two hundred fifty-five (255) days after issuance of the site and building permits.  The second amendment provided that Substantial Completion of the existing building would be no later than August 15, 2000, and the Substantial Completion of the existing building renovations would be no later than October 23, 2000.  These deadlines have not been met.  In addition, Learjet has not given its Final Acceptance of the work completed, nor of the Work as a whole, based upon numerous construction defects that serve as the basis for this Filing.

Upon opinion and belief, Konover retained the services of Fine Line Construction and Electrical (hereinafter "Fine Line") as a subcontractor under the Contract to install the requisite electrical components in the hangar, including, but not limited to, the fire detection system.  Similarly and upon opinion and belief, Treasure Coast Fire Protection Systems (hereinafter "Treasure Coast") was retained by Konover as a subcontractor to design and install the fire suppression systems for the structures.[2]  Components that would serve as the fire detection system were obtained from SimplexGrinnell, Inc. (hereinafter "Simplex"), and upon opinion and belief, Simplex also certified the correct operation of the fire

_____

[2] The fire suppression system as set forth is a very broad system including pumps, wells, sprinkler heads, sprinkler water supply lines, and a multitude of items that make up the fire suppression system for all buildings as a whole.

2

detection system at the facility, and has attempted to repair numerous defects with same, to date to no avail.

## II.    AVERMENTS AGAINST KONOVER

Konover contracted with Learjet to design and build a new hangar, construct office space and renovate an existing hangar at Learjet's Fort Lauderdale, Broward County, Florida facility.  Konover has failed to perform its duties under the contract.  Konover has not complied with the criteria set forth in the Contract and reasonable and prudent construction practices related to the fire detection system, the fire suppression system, the air conditioning system, the floor coating, the insulation for the buildings, along with numerous other construction defects, has further failed to address and rectify multiple problems with the work that have already been brought to the attention of Konover, and has failed to meet construction deadlines.

In particular, Konover failed to properly design, develop, engineer, build and test the fire detection/suppression system as outlined within the contract.  Konover failed to spend the necessary design effort, time and money to correct design deficiencies and performance problems in order to meet the requirements set forth in the Learjet Project Criteria Document, incorporated as part of the Contract by the terms of the Contract. Konover failed to properly supervise, direct or otherwise oversee the work performed by the employees and/or subcontractors under its charge in the design, development, engineering, building and testing of the fire protection/prevention system in such a manner

3

that would reasonably ensure the timely and accurate completion of the construction and such that would guarantee its proper functioning and compliance with local, state and federal guidelines, the Project Criteria, and all other requirements under the Contract, including good workmanship and compliance with reasonable and prudent construction practices.

Konover also had a duty per the Contract to verify and insure that all subcontractors to the Work at issue would have contract terms identical to (or more favorable than) the terms of the Contract between Learjet and Konover.

As a result of the defects and deficiencies set forth herein, Learjet has incurred numerous property losses and construction defect losses, as well as losses in revenue and manpower efficiency.   In addition, Learjet will continue to incur additional operating expenses and losses in revenue until all faulty work at the facility is corrected, and will incur additional expenses in correcting and replacing the faulty work performed.

Further, there are numerous other Work related deficiencies and defects which Konover has not corrected, and which Konover has an obligation to correct at no expense to Learjet, per the terms and conditions of the Contract attached hereinafter.  Learjet is also entitled to receive their costs and expenses associated with the pursuit of these defect claims from Konover, including attorneys' expenses and fees, expert expenses and fees, and all other associated costs and expenses.

4

## III.    **AVERMENTS AGAINST LAW/KINGDON**

Law/Kingdon was retained by Konover as the architectural and engineering firm on the construction project at issue.  As such, Law/Kingdon was, and is, responsible for all of the architectural and engineering plans for the project.  Law/Kingdon has failed to perform its duties under the Contract, which should run to the benefit of Learjet based upon the fact Law/Kingdon was aware of the contract terms between Learjet and Konover, and should be bound by those terms, and be as responsible to Learjet for the deficiencies in their Work as would be Konover.  Law/Kingdon failed to properly supervise the Work at issue such that numerous construction related defects and deficiencies were created at the facility by Konover and the various sub-contractors used on this Project.  Law/Kingdon further failed to act to correct such problems.

Law/Kingdon failed to properly design, develop, engineer, build and test the fire detection and fire suppression systems as outlined within the Contract, the Contract criteria, the various codes applicable to this Work, and all other reasonable design and engineering practices. Law/Kingdon failed to spend the necessary design and engineering effort, time and money to correct deficiencies and performance problems in order to meet the requirements set forth in the Learjet Project Criteria Document, incorporated as part of the Contract by the terms of the Contract.  Law/Kingdon failed to properly supervise, direct or otherwise oversee the work performed by the employees and/or subcontractors under its supervision in the design, development, engineering, building and testing of the fire protection and fire prevention systems in such a manner that would reasonably ensure

5

the timely and accurate completion of the construction, and would allow its proper functioning and compliance with local, state and federal guidelines, all Contract criteria, all applicable Codes and all reasonable and prudent design and engineering practices.

As a result, Learjet has incurred numerous property losses and construction defect losses, as well as losses in revenue and manpower efficiency as a result of the problems caused by the work supplied by Law/Kingdon.  In addition, Learjet will continue to incur additional operating expenses and losses in revenue until such point that the faulty work is corrected, and will incur additional expenses in correcting and replacing the faulty work performed.  Law/Kingdon is also responsible for all Learjet costs and expenses associated with pursuing this action, including, but not limited to, its attorneys' fees.

## IV.   AVERMENTS AGAINST FINE LINE

Upon opinion and belief, Fine Line was retained by Konover as a subcontractor in the construction of the hangar to install the electrical and all such related components per the guidelines of the Contract, the Contract criteria, and all reasonable and prudent electrical engineering and installation practices.  Further, Fine Line, per its contract with Konover, is to be as responsible to Learjet for any and all damages caused by Fine Line as would be Konover.  Therefore, based upon defects and deficiencies in the fire detection system, Fine Line has failed to properly perform its duties to Learjet.

In particular, Fine Line failed to properly install the fire detection system as outlined within the Contract, and as set forth in the Contract criteria. Fine Line failed to properly supervise, direct or otherwise oversee the work performed by the employees and/or subcontractors under its charge in the installation of the fire detection system in such a manner that would allow the detection system's proper functioning and compliance with local, state and federal guidelines.

As a result, the detection system installed by Fine Line, by and through its subcontractors, has not functioned properly since the system was installed. Learjet has incurred numerous losses in revenue and manpower efficiency as a result of the problems caused by the work supplied by Fine Line, along with extra expenses in attempting to remedy the problems caused by the defective detection system. extra expenses incurred by the County mandated "fire-watch" that is present at the facility due to the lack of dependability of the fire detection system. In addition, Learjet will continue to incur additional operating expenses and losses in revenue until such point that the faulty work is corrected, and will incur additional expenses in correcting and replacing the faulty work performed. Fine Line is also responsible for all Learjet costs and expenses associated with pursuing this action, including, but not limited to, its attorneys' fees.

7

## V.   <u>AVERMENTS AGAINST TREASURE COAST</u>

Treasure Coast was a subcontractor retained by Konover to design and construct the fire suppression system at the facility.  Further, Treasure Coast, per its contract with Konover, is to be as responsible to Learjet for any and all damages caused by Treasure Coast as would be Konover.  Therefore, based upon defects and deficiencies in the design, engineering, testing and construction of the fire suppression system, Treasure Coast has failed to properly perform its duties to Learjet.

Treasure Coast failed to properly design, engineer, build and test the fire suppression system as outlined within the contract, within all specifications, the construction Criteria, and in accordance with all applicable fire protection Codes.  Treasure Coast failed to spend the necessary design effort, time and money to correct design deficiencies and performance problems in order to meet the requirements set forth in the Learjet Project Criteria Document, incorporated as part of the Contract by the terms of the Contract. Treasure Coast failed to properly supervise, direct or otherwise oversee the work performed by the employees and/or subcontractors under its charge in the design, development, engineering, building and testing of the fire prevention system in such a manner that would reasonably ensure the timely and accurate completion of the construction and would guarantee its proper functioning and compliance with local, state and federal guidelines and applicable fire Codes.

8

As a result, Learjet has incurred numerous property losses and construction defect losses, as well as losses in revenue and manpower efficiency as a result of the problems caused by the work supplied by Treasure Coast. In addition, Learjet will continue to incur additional operating expenses and losses in revenue until such point that the faulty work is corrected, and will incur additional expenses in correcting and replacing the defective work of Treasure Coast. Treasure Coast is also responsible for all Learjet costs and expenses associated with pursuing this action, including, but not limited to, its attorneys' fees.

## VI.   AVERMENTS AGAINST SIMPLEX

Simplex was retained by Fine Line to supply components for the design and installation of the fire detection/suppression system. Further, Simplex, per its contract with Fine Line and per Fine Line's contract with Konover, is to be as responsible to Learjet for any and all damages caused by Simplex as would be Konover or Fine Line. Therefore, based upon defects and deficiencies in the design, engineering, testing and construction of the fire detection system, including, but not limited to, defects in the alarm panels, the heat detectors, pull stations, and other related components of the fire detection system, Simplex has failed to properly perform its duties to Learjet.

Simplex failed to provide components for the fire detection system that functioned properly or as intended. Said components have not properly functioned since installation and require complete redesign and replacement. Simplex has failed to supply fire

9

detection components necessary to meet the fire detection requirements as set forth in the Learjet Project Criteria Document, incorporated as part of the Contract by the terms of the Contract.  Simplex has failed to provide conforming fire detection components that would reasonably ensure the timely and accurate completion of the construction project and would guarantee the fire detection system's proper functioning and compliance with local, state and federal guidelines and fire Codes, and based upon reasonable fire detection and design requirements.

Simplex also improperly certified the correct operation of the fire detection system constructed, designed and engineered as part of the facility at issue in this claim.  Since the fire detection system was installed, there have been numerous problems with the heat detectors, the alarm panels, at least one pull station, and the operation of the system generally.

As a result, Learjet has incurred numerous property losses and construction defect losses, as well as losses in revenue and manpower efficiency as a result of the problems caused by the components supplied by Simplex.  In addition, Learjet will continue to incur additional operating expenses and losses in revenue until such point that the faulty components are redesigned and replaced, and will incur additional expenses in correcting and replacing the faulty components provided.  Simplex is also responsible for all Learjet costs and expenses associated with pursuing this action, including, but not limited to. its attorneys' fees.

10

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

02 - 61711

FINE LINE CONSTRUCTION
AND ELECTRIC, INC.

CIV-GOETTGER

## DEFENDANTS

SIMPLEX GRINNELL, L.P.

MAGISTRATE JUDGE
SELTZER

FILED BY:  2002 DEC -5

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

0:02CV 61711 NCR

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Massachusetts
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert H. Schwartz, Esq.; Jason K.
Gunther, Esq., Adorno & Yoss, 888 S.E.
3rd Ave., #500, Ft. Lauderdale, FL 33316

ATTORNEYS (IF KNOWN) James E. Zloch, Esq.; Michael T.
Dolce, Esq.; Wicker, Smith et al., P.O. Box
14460, SouthTrust Tower, 5th Flr., Fort
Lauderdale, FL 33302

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, (BROWARD) PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN × IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. §§ 1441 and 1332

IVa.  5 days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN × IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | PERSONAL PROPERTY | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | SOCIAL SECURITY | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus | | FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl Ret Inc Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. ORIGIN (PLACE AN × IN ONE BOX ONLY)

Appeal to District
- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Refiled
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint:
**JURY DEMAND:** ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE  12/5/02

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F  I-2
REV. 6/90

FOR OFFICE USE ONLY:  Receipt No. 526827  Amount: 150
Date Paid: 12/5/02  M/ifp: _____